**LOVELADIES HARBOR, INC., and Loveladies Harbor, Unit D, Inc., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 243–83L.**

United States Claims Court.

Aug. 12, 1988.

and on plaintiffs' cross-motion for partial summary judgment. In plaintiffs' motion for partial summary judgment, it is claimed that the Army Corps of Engineers' refusal to issue a fill permit for the development of 12.5 acres of plaintiffs' wetlands constituted a taking under the Fifth Amendment to the United States Constitution. Defendant's motion for summary judgment argues that no such taking has occurred. For the reasons set forth below, this court must deny the motions of both parties. Instead, this court will require further proceedings consistent with this opinion.

### Facts

In 1956, plaintiffs purchased approximately 250 acres of vacant land located on Long Beach Island in Ocean County, New Jersey for $300,000. Much of this land was wetlands which had to be filled before it could be developed. By 1972, plaintiffs had filled and constructed hundreds of homes on 199 acres of this land. By May 5, 1982,[1] all but 6.4 sporadically held acres of this 199 acre area were sold to the general public. None of these 6.4 acres were adjacent to the property in dispute.

Plaintiffs' plans to develop the remaining fifty-one acres of their original 250 acre purchase were not as successful. The development of these fifty-one acres fell into difficulty as a result of both state and federal law enacted in the early 1970's. *Compare* the New Jersey Wetlands Act of 1970, N.J.S.A. 13:9A–1 et seq. *with* the Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251–1376 (Supp. II 1972). Under state law, owners of wetlands, such as plaintiffs, were required to obtain a permit from New Jersey's Department of Environmental Protection ("NJDEP") before their wetlands could be filled. Under federal law, owners of wetlands were required to obtain a permit from the Army Corps of Engineers. It is these permit requirements which have brought plaintiffs' plans to a standstill.

The first barriers to development were principally caused by the state. In 1973, plaintiffs submitted a permit application

Kevin J. Coakley, Roseland, N.J., for plaintiffs.

Michael M. Wenig, Washington, D.C., with whom were George B. Henderson II, former Atty. of Record, and Asst. Atty. Gen. F. Henry Habicht II, for defendant.

### OPINION

SMITH, Chief Judge.

This case comes before this court on defendant's motion for summary judgment

---

1. May 5, 1982, was also the date on which the alleged taking is claimed to have occurred.

for the development of the fifty-one acres, but that permit was denied without prejudice because the application failed to contain sufficient information. Plaintiffs again applied for a permit in 1977. This application was rejected on its merits, but the NJDEP rejected the application without prejudice in order to provide plaintiffs with another opportunity to submit an alternative plan.

Rather than submit an alternative plan, plaintiffs appealed the 1977 permit denial to the Commissioner of NJDEP. Before the NJDEP administrative hearing began, NJDEP's officials made a settlement offer to plaintiffs which would have allowed plaintiffs to fill 12.5 acres out of the total fifty-one acres in dispute at that time. This offer was rejected.

During the administrative hearing, plaintiffs asserted, among other issues, that the denial of a fill permit constituted a taking of plaintiffs' property under the Fifth Amendment. The NJDEP upheld the denial of the permit and found there was no taking because the NJDEP's settlement offer would have allowed plaintiffs to utilize 12.5 acres of their land. Plaintiffs continued to challenge the denial by resorting to state court where plaintiffs again met with no success. *In re Loveladies Harbor, Inc.,* 176 N.J.Super. 69, 422 A.2d 107 (1980), *cert. denied,* 85 N.J. 501, 427 A.2d 588 (1981).

In 1981, plaintiffs applied for still another fill permit. Yet, this time plaintiffs sought to fill only 12.5 acres of the original fifty-one acre area in accordance with the NJDEP's previously rejected settlement offer. Although the NJDEP held that plaintiffs' proposal still did not meet its qualifications, the NJDEP agreed to the issuance of the permit because the NJDEP felt bound by that offer. However, the NJDEP did not issue a permit for the entire 12.5 acres. Rather, the state issued a permit for only 11.5 of these acres because it was determined that one acre had already been filled and thus did not require authorization from the NJDEP.

When plaintiffs began their mostly unsuccessful effort at obtaining a state permit for their entire fifty-one acres of undeveloped land, plaintiffs also sought the issuance of a land permit from the Army Corps of Engineers. Plaintiffs' first and second applications with the Army Corps of Engineers were filed at approximately the same time in which plaintiffs filed their first and second application with the NJDEP. Both of these applications were rejected on the basis of the NJDEP's corresponding refusals.

In 1981, after plaintiffs' claims were denied in state court, plaintiffs sought the issuance of a permit from the Army Corps of Engineers for a third time. This application only included a request for the fill of the 12.5 acres of wetlands later allowed by the NJDEP. The application was then reduced to a request for the development of only 11.5 acres when it was discovered that one of the acres was uplands and thus did not require the authorization of the Corps. This application also eliminated the use of bulkhead material from the original proposals filed in the 1970's.

Despite the above modifications, this third application for a fill permit was ultimately denied on May 5, 1982. The central reason behind the denial was the government's desire to preserve the wetlands along with its attendant wildlife and vegetation. Plaintiffs later challenged the validity of the denial in federal district court, but the denial was upheld. The district court's decision was subsequently affirmed on appeal. *Loveladies Harbor Inc. v. Baldwin,* Civil No. 82–1948 slip op. (D.N.J. Mar. 12, 1984) (unpublished), *aff'd without opinion,* 751 F.2d 376.

After their failure to overturn the Army Corps of Engineers' permit denial in federal district and appellate court, plaintiffs initiated the present action. Plaintiffs now concede that the permit denial issued on May 5, 1982, was valid. Instead, they contend that this permit denial effected a Fifth Amendment taking of plaintiffs' property. Their claim seeks recovery for the loss of value to the 11.5 acres of wetlands and to the one acre of uplands which could have otherwise been developed under the permit requirements of New Jersey.

## DISCUSSION

The Fifth Amendment guarantees that private property shall not "be taken for public use, without just compensation." This constitutional guarantee is more than just a limitation against the physical seizure or invasion of property by the government in the name of the public good. The Fifth Amendment also provides just compensation against governmental regulations which effectively accomplish the same destructive end. *See, e.g., English Evangelical First Lutheran Church v. Los Angeles County,* 482 U.S. 304, 107 S.Ct. 2378, 2386–87, 96 L.Ed.2d 250 (1987) (interim ed.). The issue here is whether the Army Corps of Engineers' denial of a fill permit constitutes so great an intrusion as to mandate just compensation.

### *Jurisdiction*

Before this court can reach the merits of plaintiffs' takings claim, it must first decide a question of jurisdiction initially raised by the government during oral argument. At that time, defendant argued that this court was without jurisdiction because the controversy at bar was not sufficiently ripe for the court's review.

It is well-settled that a takings claim is premature where the private litigant never submitted a plan or application for development to the governing body whose approval was required. *E.g., Agins v. Tiburon,* 447 U.S. 255, 261, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *Burlington N.R.R. Co. v. United States,* 752 F.2d 627, 630 (Fed. Cir.1985). In this case, plaintiffs have met this requirement. They submitted their application for a fill permit to the Army Corps of Engineers as was required by the Clean Water Act, and that application did contain a proposed plan for development. Plaintiffs' application was then denied after a lengthy administrative review.

■ Defendant concedes that plaintiffs' actions met this threshold but contends that more activity was required in order to make this controversy sufficiently ripe for litigation. In particular, defendant contends that plaintiffs were required to submit alternative applications containing less ambitious proposals as well as at least one application for variance.

Defendant's contention that less ambitious proposals are required is grounded in Supreme Court precedent. It stems from the Court's decision in *MacDonald, Sommer & Frates v. Yolo County* which states that the "[r]ejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." 477 U.S. 340, 353 n. 9, 106 S.Ct. 2561, 2569 n. 9, 91 L.Ed.2d 285 (1986).

Upon review of that decision, this court must agree that the Court in *MacDonald* did require the private litigant in that case to submit other less ambitious proposals besides the one plan rejected. The problem with requiring plaintiffs to submit other proposals in this case, however, is that the facts of *MacDonald* are distinguishable in an important respect.

In *MacDonald,* the local permit request was for the development of 159 single-family and multi-family housing units. That request was denied by the local county planning commission on the basis of four objections: (1) the plan did not provide any access to the public street, (2) the plan did not provide for any sewer systems, (3) the plan was too intense for an adequate level of local police protection, and (4) that no provision was made for the creation or maintenance of a water system. *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 342–43, 106 S.Ct. at 2563–64. In sum, the local county did not reject the housing plan because housing construction was unacceptable per se, but rather because the plan was lacking in certain limited respects.[2] Thus, the controversy

---

2. In fact, the county's limited objections over the lack of street access, sewer facilities, and water facilities may not have required any reduction at all in petitioners' planned development of the 159 family homes. The only objection which may have required some reduction in home development was the county's concern that the development was too intense under the then present level of police protection. Thus, while the reduction required was unknown, it seems certain that compliance would not have

*MacDonald* could not be considered sufficiently final or definitive since there was no way of determining the amount of housing units that the county commission would have allowed if its objections were ultimately met. *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 351–53, 106 S.Ct. at 2568–69.

In contrast with the facts in *MacDonald,* the objections encountered by plaintiffs' 11.5 acre fill permit application in this case rendered housing development on the 11.5 acres of wetlands unacceptable per se. The objections were based upon environmental concerns, and any such plan for development would have had a destructive effect to the 11.5 acres of wetlands and their attendant wildlife. Moreover, the Army Corps of Engineers failed to provide any alternative option for development. The only alternative that the Army Corps of Engineers did suggest was the possible utilization of the one adjacent acre of uplands [3] as long as that one acre could be developed without filling the wetlands. Even defendant's experts base their estimates solely on the possible value of utilizing the one acre of uplands. A final, definitive, govermental position as required by *MacDonald,* therefore, does exist here, and the submission of other less ambitious proposals must be considered unnecessary.

Even if this court were to accept defendant's dubious premise that *MacDonald* required the submission of less ambitious alternative proposals in all instances, plaintiffs' claim would still have to be considered ripe for review. Plaintiffs' plan rejected by the Army Corps of Engineers in 1982 was not the first of plaintiffs' development plans to come before the Army Corps of Engineers. The plan rejected in 1982 was modified some months earlier. That modification was less ambitious since it eliminated the use of bulkhead material from the original proposal. It also reduced the other fill material required since it was discovered that one of the 12.5 acres of wetlands was actually uplands.

Moreover, this court is not unmindful of the previous two proposals for development of its fifty-one acre area of wetlands submitted in the 1970's. While this court realizes that these plans were ultimately rejected because of obstacles imposed by the State of New Jersey and not because of obstacles imposed by the Army Corps of Engineers, the court, nevertheless, feels compelled to allow plaintiffs an opportunity to present their case. Plaintiffs should not be forced to resort to piecemeal litigation nor some endless series of requirements. *See MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 350 n. 7, 106 S.Ct. at 2567 n. 7. The requirements of ripeness in the area of Fifth Amendment takings also cannot be so extended as to become more exhaustive than the substantive issues presented by the taking claim itself.

■ As previously stated, defendant also contends that the plaintiff is required to submit an application for variance before this case can be considered ripe for review. Defendant bases this argument on *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 57 L.Ed.2d 126 (1985). *Williamson* was the first Supreme Court decision to increase the ripeness requirement beyond the mere submission and rejection of a permit application. In that decision, the court additionally required, as defendant contends, that a private litigant submit an application for variance and await its denial.

The problem with applying *Williamson* to this case, however, is that *Williamson* involved an alleged taking by a local county zoning commission. It did not involve an alleged taking by the federal government, like the taking claim presented here. The progeny of that decision has been limited to those situations involving alleged violations by local zoning commissions as well. *E.g., Culebras Enter.'s Corp. v. Rivera Rios,* 813 F.2d 506, 515 (1st Cir.1987); *Lit-*

---

altogether precluded the planned development of all 159 homes.

**3.** As stated earlier, the development of this acre was only possible because the acre was uplands and thus outside the jurisdiction of the Army Corps of Engineers.

tlefield v. City of Afton, 785 F.2d 596, 609 (8th Cir.1986); see also, e.g., Kinzli v. City of Santa Cruz, 818 F.2d 1449, 1454 (9th Cir.1987) (plaintiff was generally required to seek a variance from permit denial by the city, but was not required to seek the variance where that application would be futile), cert. denied, — U.S. —, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988); Corn v. City of Lauderdale Lakes, 816 F.2d 1514, 1515 (11th Cir.1987) (plaintiff was generally required to seek a variance from a permit denial by the city, but was not required to seek the variance where that application would be futile); Kaiser Dev. Co. v. City and County of Honolulu, 649 F.Supp. 926, 940 (D.Hawaii 1986) (variance not required where it would be futile to pursue). Therefore, the question of extending the variance requirement into the context of federal takings law presents a novel issue before the court.

It is easy to understand the rationale behind the Supreme Court's variance requirement in a takings case involving local zoning law. Variances are a feature commonly provided under state and local zoning enabling acts. A. Dawson, Land–Use Planning and the Law 38 (1982). They, in effect, provide the holder of this special permit with the privilege of violating the law created by the zoning plan. C. Crawford, Jr., Strategy and Tactics in Municipal Zoning 35 (1979). Besides creating flexibility, the variance procedure was created as a safety valve in order to avoid overly strict ordinances which would make the property so unusable as to constitute a Fifth Amendment taking. F. Schniman, S. Abrams, J. Delaney, Handling the Land Use Case § 1.3.6, at 20 (1984); A. Dawson, Land–Use Planning and the Law 38 (1982); D. Hagman, Urban Planning and Land Development Control Law § 106, at 196 (1971). Thus, the Supreme Court has required the variance requirement on the issue of ripeness in order to prevent judicial decisions on constitutional takings questions where decisions on those questions would be unnecessary. See Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. at 186–97, 105 S.Ct. at 3116–22.

In this situation, the variance procedure or some similar alternative that would avoid unnecessary litigation does not exist. The Water Pollution Prevention and Control Act and its attendant regulations which imposed the restriction on plaintiffs' property generally do not provide a safety valve in order to prevent taking claims. There is only one limited exception in which the restrictions of the Act and its attendant regulations can be overridden. This exception occurs in instances where the restrictions may cause a detrimental effect on navigation and anchorage. The Water Pollution and Control Act as amended by the Clean Water Act of 33 U.S.C. § 1344(b)(2) (Supp. I 1977); Fisher, Minnesota Water Management Law and Section 404 Permits: A Practitioner's Perspective, 7 Hamline L.Rev. 249, 309 (1984) (explaining 33 U.S.C. § 1344(b)(2)). Since plaintiffs' permit request was solely for the development of residential housing, it is hard to imagine any detrimental effect to navigation or anchorage that would have resulted from a denial of plaintiff's permit application. The pursuit of a variance or some similar alternative, therefore, should not be imposed in this instance where no such alternative was available. See Corn v. City of Lauderdale Lakes, 816 F.2d at 1516; Kaiser Dev. Co. v. City and County of Honolulu, 649 F.Supp. at 940–42. This court, accordingly, holds that plaintiffs' claim is ripe for review.

### Merits

A constitutional taking by the government can be established in one of two ways. First, a taking can occur where the imposition of a government regulation fails to substantially advance a legitimate governmental interest. E.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 107 S.Ct. 1232, 1242, 94 L.Ed.2d 472 (1987) (interim ed.) (quoting Agins v. Tiburon, 447 U.S. at 260, 100 S.Ct. at 2141). Second, a taking can occur where the imposition of a governmental regulation has the effect of depriving the owner's land of all economic value. See, e.g., id.

The Substantial Advancement Test

The determination of whether there is a substantial advancement of a legitimate governmental interest necessarily requires that the governmental regulation was intended to promote the public welfare, rather than some private interest. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. at 485–93, 107 S.Ct. at 1242–46. However, the mere fact that the governmental regulation was intended to promote a public benefit is not sufficient to satisfy the test. This determination must also involve the court's weighing of that intended public benefit against the harm inflicted upon the landowner involved. *Agins v. Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141.

■ The requirement that the Army Corps of Engineers issue a fill permit before wetlands can be developed clearly falls within the promotion of the public welfare. This statutory requirement was enacted for the preservation of wetlands as a productive and valuable resource. *Avoyelles Sportmen's League v. Alexander*, 473 F.Supp. 525, 531 (W.D.La.1979). Furthermore, wetlands unquestionably constitute navigable waters, *e.g., Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 647 (5th Cir. 1983), and the restoration and maintenance of the chemical, physical, and biological integrity of these waters was Congress' central objective. *See* 33 U.S.C. at § 1251(a) (Supp. I 1977).

■ Weighing against this public interest is plaintiffs' right to fill and develop their land. According to plaintiffs, the government's refusal to issue a fill permit for plaintiffs' property has, in effect, practically nullified the value of its 12.5 acres. Plaintiffs estimate that these acres have been reduced from a value of $3,790,000 to a value of only $13,725.50.[4]

In balancing the governmental interest in preserving wetlands under section 404 of the Clean Water Act against the value of

plaintiffs' land, other jurisdictions have found the balance in favor of the government. *Smithwick v. Alexander*, 12 Envtl. L.Rep. (Envtl.L.Inst.) 20790, (E.D.N.C.1981) (LEXIS, Genfed library, Dist. file); *Am. Dredging Co. v. State Dept. of Envtl. Protection*, 161 N.J.Super. 504, 391 A.2d 1265, 1270 (1978), *aff'd*, 169 N.J.Super. 18, 404 A.2d 42 (1979) (per curiam); *Just v. Marinette County*, 56 Wis.2d 7, 201 N.W.2d 761, 767 (1972). Indeed, this was the position of the Court of Claims. *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 489, 657 F.2d 1184, 1192 (1981). Yet, these decisions from other jurisdictions have no binding precedence upon this court. *See Alaskan Arctic Gas Pipeline Co. v. United States*, 9 Cl.Ct. 723, 726 (1986) *aff'd on other grounds*, 831 F.2d 1043 (Fed.Cir. 1987). As for the Court of Claims' decision in *Deltona*, it was only binding precedent on this court until a contrary decision was issued by the Federal Circuit. *See* RUSCC General Order No. 1, 1 Cl.Ct. XXI.

When the Federal Circuit balanced the governmental interest in preserving wetlands against the loss of value to the landowner's property, the Federal Circuit found that the balance fell in favor of the landowner. *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987) (interim ed.). Specifically, the court stated that "[t]his appears to be a situation where the balancing of public and private interests reveals a private interest much more deserving of compensation for any loss actually incurred." *Id.* at 904. The court found the balance in favor of the landowner because the Clean Water Act's preservation of wetlands was not for the prevention of a public harm but rather for the maintenance of a public benefit. *Id.*

Defendant contends, however, that the Federal Circuit Court's discussion of this balance was merely obiter dicta because the issue was never briefed on appeal and

**4.** Defendant concedes plaintiffs' $13,725.50 post-denial valuation for the sole purpose of resolving defendant's motion for summary judgment. Defendant contests the $13,725.50 post-denial valuation, however, with respect to plaintiffs'

cross-motion for partial summary judgment. According to defendant's estimates, the post-denial value of the land is instead worth $680,000. *See generally Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 375 (1988).

because the court noted at the beginning of its opinion that it would not be a finder of facts. *Id.* at 893. This court does not agree. An appellate decision on an issue cannot be rendered dicta simply because that issue was not fully briefed by either party.[5] *United States v. Pierre*, 781 F.2d 329, 333 (2d Cir.1986); *Monell v. New York City Dept. of Social Serv.'s*, 436 U.S. 658, 709, 98 S.Ct. 2018, 2045, 56 L.Ed.2d 611 (1977) (Powell, J. concurring) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). Nor could it be said that the Federal Circuit acted as finder of facts as defendant contends. All the Federal Circuit did was to require the lower court to act "according to the right principles." *Florida Rock Indus., Inc. v. United States*, 791 F.2d at 894.[6] The Federal Circuit's balancing of governmental and private interests in *Florida Rock*, therefore, should not be ignored but instead should be treated as one of those binding "right principles" enunciated by the court.

Defendant alternatively argues that the Federal Circuit's decision to hold the balance in favor of the private interest should not apply even if that holding was not obiter dicta. Defendant attempts to distinguish this holding by reminding the court that each takings claim must rest on its own facts and circumstances. *E.g., Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986); *see, e.g., Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1961). While it is, indeed, true that takings claims must rest on their own facts and circumstances, there are no grounds for distinguishing this case from the facts involved in *Florida Rock*. In both cases, the public interest in preserving the wetlands was the same. More-

over, the pollution caused by plaintiff in this case, like that caused by the private litigant's in *Florida Rock*, cannot be considered harmful since the possible pollution is of a kind that is merely incidental to any human action undertaken. *See Florida Rock Indus., Inc. v. United States*, 791 F.2d at 904 (private litigants who intended to mine the property were merely pro forma polluters). In fact, the possible pollution involved in this case seems to be even less substantial. Plaintiffs in this case are merely seeking to develop residential lots and make this acreage part of a beachfront community—they are not intending to disturb the land through the more intrusive procedure of blasting and dredging in order to mine limestone as was desired by the private litigants in *Florida Rock*. *Id.* at 895–96.

While the balancing of plaintiffs' private interests and the government's public interests reveals a private interest much more deserving of compensation, this court is most reluctant to hold that a taking has occurred on this basis alone. The court's reluctance is grounded on two concerns. First, there are problems with using the harm/benefit distinction as a method for balancing both the private and public interests. Second, the overall balancing of the private and public interests involved, as required under the legitimate state interest test, *see generally, Agins v. Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141, is generally not a useful guideline for making a takings determination.

The problem with the harm/benefit distinction is that it is often difficult to differentiate between the situation where the government is acting to preserve benefits from the situation where the government is acting to prevent harm. The facts present-

---

5. Moreover, even if this balancing test in *Florida Rock* were dicta, it would be entitled to great weight since there is no Supreme Court precedent to the contrary. *See Max M. v. Thompson,* 585 F.Supp. 317, 324 (N.D.Ill.1984).

6. This court must also emphasize that the Federal Circuit's view of the harm done to the wetlands was not an issue of casual importance. The Federal Circuit devoted an entire section of its opinion to the issue and felt that the issue was significant enough to include in the opin-

ion's conclusion. In that conclusion, the court once again stated "that the trial court committed an error of law in investigating and determining [that the intrusion to the wetlands created a public harm], notwithstanding the district engineer's finding that there was at least some *de jure* pollution to be anticipated from Florida Rock's project, [where] in reality there was none." *Florida Rock Indus., Inc. v. United States,* 791 F.2d at 903.

ed in *Florida Rock* are squarely on point. Though it could be held, as the Federal Circuit did in *Florida Rock*, that the Act preserving the wetlands was only for the preservation of aesthetic benefits, it could have also been argued that the Act preserving the wetlands was for the prevention of harm to the environment. Thus, both characterizations used in the harm/benefit distinction can often be used for the same act since there is no benchmark standard of objectivity. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation Law,"* 80 Harv.L. Rev. 1165, 1197 (1967).

The difficulty that this court has with the legitimate state interest test as originally espoused in *Agins v. Tiburon*, 447 U.S. at 261, 100 S.Ct. at 2141, stems from that test's application in prior federal court decisions. While the Supreme Court and other federal courts have consistently stated that a taking occurs "if the [governmental action] does not substantially advance a legitimate state interest ... or denies the owner economically viable use of his land," *e.g., United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 126, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985) (*quoting Agins v. Tiburon,* 447 U.S. at 260, 100 S.Ct. at 2141), no court has ever found that a taking has occurred solely because a legitimate state interest was not substantially advanced.[7] In fact, federal courts have never rested their decision on that determination alone but have found it necessary in every case to include a discussion on the economically viable use of the property at issue.[8] *E.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. at 493–506, 107 S.Ct. at 1246–53; *Florida Rock Indus., Inc. v. United States,* 791 F.2d at 904; *Rymer v. Douglas County,* 764 F.2d 796, 800–01 (11th Cir.1985) (per curiam).

Therefore, because of the lack of precision in the harm/benefit distinction and because of prior federal court precedent in this area, this court cannot find a taking simply because there was no substantial advancement of a legitimate state interest. Instead, the lack of a legitimate state interest in this case must be considered as one of several overall factors used to determine whether or not just compensation is required. *See Belk v. United States,* 12 Cl.Ct. 732, 733–35 (1987), *appeal docketed,* No. 87–1631 (Fed.Cir. Sept. 29, 1987) (*Shanghai Power Co. v. United States,* 4 Cl.Ct. 237, 243 (1983)), *aff'd without opinion,* 765 F.2d 159 (Fed.Cir.1985), *cert. denied,* 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985).

The Economic Viability Test

There is no set formula which delineates the exact line where a regulation ends and a constitutional taking begins. *E.g., Goldblatt v. Hempstead,* 369 U.S. at 594, 82 S.Ct. at 990. Thus, as already stated above, this court is required to review the

---

**7.** The substantial advancement test, however, has been applied to deny takings claims in certain instances. Denial of takings claims in such circumstances has occurred where "the government [was] exercis[ing] its unquestioned authority to prevent a property owner from using his property to injure others...." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. at 511, 107 S.Ct. at 1256 (Rehnquist, J., dissenting). This situation, referred to as the nuisance exception, *id.,* has been held to deny takings claims even where the property in question has undergone a severe reduction in value and use. *See Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (the state was allowed to destroy cedar trees without providing compensation where infected trees posed a threat to apple orchards in the region); *Allied–Gen. Nuclear Serv.'s v. United States,* 839 F.2d 1572, 1576–77 (Fed.Cir.1988) (processing of nuclear fuel could be prevented without constituting a taking because it was perceived as injurious to the public safety).

**8.** Even the decision which originated the substantial advancement of a legitimate state interest test, *Agins v. Tiburon,* failed to rely upon that test alone. *See* 447 U.S. at 260–62, 100 S.Ct. at 2141–42. That opinion, like all the other takings opinions, included an additional discussion concerning the possible economically viable uses remaining in the property claimed as taken. *See id.*

The Supreme Court's use of prior court precedent in *Agins v. Tiburon* is also of interest. That test was not formulated by the Court out of previous takings cases but rather from a case concerning alleged violations of due process. *See id.* (citing *Nectow v. Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928) (case involving a due process claim against the validity of a local ordinance)).

facts and circumstances in each particular case. *E.g., Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. at 224, 106 S.Ct. at 1025. Yet, three factors have consistently been influential in this analysis: (1) the character of the governmental action; (2) the economic impact of the regulation on the claimant, and (3) the extent to which the regulation has interfered with reasonable investment-backed expectations. *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. at 495, 107 S.Ct. at 1247 (citing *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)); *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. at 224–25, 106 S.Ct. at 1025–26.

When examining the character of the governmental action as required under the first factor, this court must determine whether the act closely parallels an act of eminent domain. In other words, the central question is whether the act is equivalent to the physical invasion or destruction of substantial rights held in the property. *See, e.g., Nollan v. Ca. Coastal Comm'n,* — U.S. ——, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (governmental action mandating that landowner allow public access onto part of his property constituted a taking); *Pumpelly v. Greenbay Co.,* 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872) (construction of a dam which permanently flooded plaintiff's property constituted a taking); *Kaiser Aetna v. United States,* 444 U.S. at 164, 100 S.Ct. at 384 (the imposition of a navigational servitude requiring public access to a pond constituted taking); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (governmental action requiring the landowner to permit a cable television company to install its cable facilities upon the landowner's property constituted a taking). These substantial rights include the right to possess, use, and dispose of the property, *Loretto v. Teleprompter,* 458 U.S. at 435, 102 S.Ct. at 3176 (citing *United States v. GM Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945)), as well as the right to exclude others. *Kaiser Aetna v. United States,* 444 U.S. at 179, 100 S.Ct. at 392. While plaintiffs have been prevented from a substantial use in their property, their rights to possess, dispose, and exclude others have not been directly hindered. Therefore, the character of the governmental action in this case cannot be considered equivalent to the physical destruction or intrusion attendant with an act of eminent domain.

The second and third factors, i.e., the regulations' economic impact and its interference with reasonable investment-backed expectations, do not focus directly upon the rights lost in the property. Instead, each factor compares the property before and after the regulation's interference. The economic impact approach measures the differing fair market values in the property. Yet, even though these approaches attempt to resolve the same question of when the regulation goes so far as to constitute a taking from alternative perspectives, the application of each of these approaches is frequently intertwined. *See for example, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. at 494–506, 107 S.Ct. at 1247–53; *Deltona Corp. v. United States,* 228 Ct.Cl. at 489–93, 657 F.2d at 1184.

### The Parcel As a Whole

Central to the dispute in this case is which property should be considered when measuring both the severity of the regulation's impact and its frustration of reasonable investment-backed expectations. Plaintiffs and defendant agree that:

> 'Taking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this court focuses rather on both the character of the action and on the nature of the interference with rights in the parcel as a whole....

*Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 130–31, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631. In this case, however, the critical issue is how to define what the whole parcel includes. It is plaintiffs' contention that this court should only include

the effected 12.5 acres as the whole and then compare the reduced value of the 12.5 acres after the permit denial to the value of those 12.5 acres before the permit denial. Defendant, on the other hand, urges that the original 250 acre purchase should be considered as the whole, and that the reduced value of the 12.5 acres after the permit denial should be compared to the value of the original 250 acre parcel.

Most of the case law provides little guidance as to which property should be included in the parcel as a whole where only part of the landowner's originally purchased acreage was still owned when the claimed taking was said to have occurred. This is because in most cases the original acreage purchased and the acreage held by the landowner at the time of the taking have been one and the same. See for example, e.g., *Agins v. United States*, 447 U.S. at 257, 100 S.Ct. at 2139; *Jentgen v. United States*, 228 Ct.Cl. at 533–34, 657 F.2d at 1211–12. The only case of binding precedent in this court in which the landowner owned a different amount of acreage at the time of the taking from the amount which he originally purchased was in *Deltona v. United States*. In that case, the Court of Claims did compare the reduced value of the landowner's property still owned after the claimed taking to "the total acreage of Deltona's original purchase." 228 Ct.Cl. at 490, 657 F.2d at 1188–89. Yet, the Court of Claims only made this comparison as the first of "[a] few statistics." *Id.* The other comparisons only included property which was held by the landowner when the claimed taking already occurred. Of these two comparisons, the one which the Court of Claims found to be "most striking" was not only limited to property held at the time of the claimed taking but also further limited to planned areas which were effected by the interfering regulation. *Id.* Thus, *Deltona v. United States* cannot be read to require a rigid rule that the parcel as a whole must include all land originally owned by plaintiffs.

Additional guidance on how to define the parcel as a whole, has also been enunciated

by the Supreme Court in *Keystone Bituminous Coal Ass'n v. DeBenedictis.* 480 U.S. at 497, 107 S.Ct. at 1248. *Keystone* involved several companies which had been extracting coal from certain mines in Western Pennsylvania since the turn of the century. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 771 F.2d 707, 710 *aff'd*, 480 U.S. at 470, 107 S.Ct. at 1232. The coal companies brought suit alleging that a taking had occurred as a result of a Pennsylvania statute enacted in 1966 which required the companies to leave a portion of their coal in place. One of the central issues addressed by the Supreme Court was how to define the parcel as a whole. In formulating a definition, the Supreme Court included more than the affected property, i.e., that portion of the coal which the statute required to remain in place. Yet, the Supreme Court did not include all the property which was held at the time of the original purchase, i.e., all of the coal which was in the ground when the property was originally purchased in the early 1900's. Rather, the Supreme Court defined the value of the parcel as a whole as "the value that remain[ed] in the property" when the taking was said to have occurred. *Keystone Bituminous Coal Ass'n v. DeBenedictis.* 480 U.S. at 497, 107 S.Ct. at 1248. The Court then treated the value of the 1.46 billion tons of coal which still remained in the ground as the whole. Therefore, on the basis of *Keystone*, this court cannot include the value of all of the property originally purchased as the parcel as a whole. Instead, this court must limit its focus upon the value of that property which plaintiffs held when the taking was said to have occurred.[9] This property amounted to 57.4 acres out of the original 250 acre parcel.

Not all properties held at the time of the taking can always be considered as part of the parcel as a whole. In *Florida Rock*, the Federal Circuit excluded 1,462 acres out of a 1,560 acre total even though plaintiffs in *Florida Rock* held a total parcel of 1,560 at the time of the claimed taking. 721 F.2d at 904–05. While the Federal Circuit stated that the comparison

9. The date of the claimed taking was May 5, 1982. Footnote 1.

of the property taken to all of the property held was normally of decisive importance, the Federal Circuit excluded 1,462 of those acres because it was a near certainty that these acres would not be able to obtain the permits needed for those acres utilization. Specifically, the court stated that it did "not think that the mere possibility one might put a pot of water on a hot stove and have it freeze, is a reality requiring ... [the Court] to deem that viewing the 1,560 acres[, rather than just the 98 acres of property claimed taken,] as a whole." *Id.* In this case, 38.5 acres of plaintiffs' presently held land must be excluded under the same rationale. After all, there is no possibility one might put a pot of water on a hot stove and have it freeze in this instance since these 38.5 acres have already been denied the necessary permits from the State of New Jersey.

█ With respect to the remaining 18.9 acres of property, only 12.5 of those acres are at issue in this case. The other 6.4 acres were part of the original 250 acre purchase and were in plaintiffs' possession when plaintiffs filed their complaint with the court. These 6.4 acres, however, were not effected by the Army Corps of Engineers' permit denial and were, accordingly, not claimed as part of the 12.5 acre parcel taken by defendant. While property so characterized would normally be considered as part of the whole, *see Deltona Corp. v. United States*, 228 Ct.Cl. at 489–92, 657 F.2d at 1192–94; *Jentgen v. United States*, 228 Ct.Cl. at 533–34, 657 F.2d 1213–14, these 6.4 acres must, nonetheless, be excluded. The reason for this exclusion is that all of these 6.4 acres had become sporadically held units of property, all of which were no longer contiguous with the 12.5 acres at issue. Such physically non-

adjacent or non-contiguous property cannot be considered as part of the single parcel as a whole just because it was formerly owned by plaintiff at one time. *Am. Savings and Loan Assoc. v. County of Marin*, 653 F.2d 364, 369 (9th Cir.1981).

Indeed, even in *Penn Central*, the leading takings case which required property to be viewed as a whole, such noncontiguous property was excluded from consideration. 438 U.S. at 131, 98 S.Ct. at 2663. In *Penn Central*, the effected area, designated as the landmark site, was only one of a number of scattered properties in downtown Manhattan held by the Penn Central Transportation Company at the time that the taking was said to have occurred. *Id.* at 115, 98 S.Ct. at 2654. Nevertheless, the parcel as a whole designated by the court only included "the city tax bloc designated as the landmark site" and failed to include these other scattered noncontiguous properties. *Id.* at 130–31, 98 S.Ct. at 2662–63.[10] Thus, by implication, non-contiguous properties not directly at issue cannot be said to fall within the parcel as a whole.

The ultimate amount of property to be considered part of the parcel as a whole in this case is, accordingly, the 12.5 acres at issue. Because the cross motions here are predicated upon different questions of material fact, the facts of each motion must be reviewed separately. The facts under defendant's motion for summary judgment will be reviewed first, followed by a review of the facts under plaintiffs' cross-motion.

## A.

### *Review of Defendant's Motion for Summary Judgment*

█ For the purposes of defendant's motion for summary judgment, both par-

---

**10.** In reaching this court's interpretation of *Penn Central*, this court has not ignored *Penn Central's* later discussion with respect to those nonadjacent properties. *Id.* 98 S.Ct. at 2656–57. This discussion of those other properties did not emerge in the context of viewing the property as a whole but rather as a consequence of the mitigation provided by the local ordinance. In *Penn Central*, the local ordinance did not just deny plaintiff the right to utilize its air property rights; the local ordinance also provided transferable development air rights in order to mitigate plaintiff's loss. These transferable develop-

ment rights, in effect, gave plaintiff additional zoning development opportunities with respect to plaintiff's other nonadjacent, nearby properties. Thus, the nearby, adjacent properties became part of the court's consideration because their value was enhanced in order to offset the loss of value to the property in dispute.

Yet, in this case, no offset has been provided to the 6.4 acres of sporadically held properties. Plaintiffs' 12.5 acres have simply been reduced in value. Therefore, in the absence of any such enhancement, these 6.4 acres must be excluded from this court's consideration.

ties agreed on the values and potential uses for the 12.5 acres in question so there would be no genuine issues of material fact. *See generally* RUSCC 56(c). Both parties agreed that the value of the property before the permit denial was approximately $4 million and that the property could have been used for residential development if the permit had not been denied. As to the value of that property after the permit denial, both parties agreed to the valuation made by the Ard Appraisal Company (Ard). The Ard appraisal estimated the value of the property after the permit denial at $13,725.50. That $13,725.50 valuation was based on the possibility that the property could have been purchased by the private sector for conservational uses or by the government for additional space in a nearby wildlife refuge.

In order to resolve a takings claim, it is first required that the value taken from a property be compared with that value remaining. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. at 497, 107 S.Ct. at 1248. This comparison cannot simply reveal a mere diminution of value for "government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922); *accord, e.g., Skaw v. United States*, 740 F.2d 932, 939 (Fed.Cir.1984); *Jentgen v. United States*, 228 Ct.Cl. at 532, 657 F.2d at 1213. Upon review of the undisputed facts included within defendant's motion, it is clear that more than just a mere diminution of value has taken place. The undisputed facts of this motion instead indicate a diminution in value which was severe; so severe, in fact, that the resultant value of the property was but a negligible portion of the property's value before the permit denial. The loss of value incurred was over 98%, with the value of the property falling from

$3,790,000 before the permit denial to a value of only $13,725.50 afterward.

Nevertheless, it is still possible for defendant's motion for summary judgment to be granted against plaintiffs' takings claim as a matter of law. A reduction in value to the land as a result of the permit denial is only one relevant factor in the determination of a takings question; it is not conclusive. *See Goldblatt v. Hempstead*, 369 U.S. at 594, 82 S.Ct. at 990. This is because a reduction in value to plaintiffs' property is not sufficient grounds for establishment of a taking where that reduction in value was the sole basis for the taking claim. *E.g., Penn Cent. Transp. Co. v. New York City*, 438 U.S. at 131, 98 S.Ct. at 2662; *Goldblatt v. Hempstead*, 369 U.S. at 594, 82 S.Ct. at 990; *Jentgen v. United States*, 228 Ct.Cl. at 532, 657 F.2d at 1213. Indeed, even losses amounting to as much as approximately 90% of a property's value have not been held as a sufficient reduction for takings purposes under such circumstances.[11] *See Hadacheck v. Sebastian*, 239 U.S. 394, 405, 36 S.Ct. 143, 144, 60 L.Ed. 348 (1915); *see also Village of Euclid v. Amber Realty Co.*, 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (reduction of value of 75% alone is insufficient to establish a taking); *cf. Q.C. Constr. Co. v. Gallo*, 649 F.Supp. 1331 (plaintiff was entitled to compensation under the Fifth Amendment where the land had suffered a 90% reduction in value and only had passive use as an empty lot), *aff'd without opinion*, 836 F.2d 1340 (1st Cir. 1987).

The establishment of a takings claim also requires the allegedly injured plaintiffs to show that the property involved has been deprived of all economically viable use. *E.g., Lake Nacimento Ranch Co. v. County of San Luis Obispo*, 830 F.2d 977, 981 (9th Cir.1987); *1902 Atlantic Ltd. v. Hudson*, 574 F.Supp. 1381, 1405 (E.D.Va.1983);

11. This court realizes that the 98% reduction shown here is greater than the reductions shown in *Hadacheck v. Sebastion* and in *Village of Euclid v. Amber Realty Co.* In fact, the reduction in value in this case amounts to the almost total elimination of the value of the property involved. Therefore, it is possible that

a court could hold such a loss as sufficient grounds for the establishment of a takings claim *in and of itself.* Yet, this court need not reach this issue at this juncture for the property's reduction in value does not stand as the sole basis of plaintiffs' taking claim.

see *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 14–15, 104 S.Ct. 2187, 2196–97, 81 L.Ed.2d 1 (1984) (the substantial reduction in value to the property was held insufficient where the petitioner was free to make whatever use it pleased of the property, including the cutting down of trees or the development of the land in some way). In other words, after a showing of devaluation has been made, the focus of inquiry must turn to the remaining possible uses that the interfering regulations permit. *Penn Central Trans. Co. v. New York City,* 438 U.S. at 131, 98 S.Ct. at 2662; *Deltona Corp. v. United States,* 228 Ct.Cl. at 488–89, 657 F.2d at 1191. These uses need not be limited to those activities which are commercially profitable but also can include those activities of recreational value. *Hendricks v. United States,* 14 Cl.Ct. 143, 156–57 (1987) (recreational uses such as the hunting of deer, ducks, and other wildlife, were sufficient uses to defeat a takings claim).

Under the undisputed facts provided by defendant's motion for summary judgment, the property in question was left with no viable commercial or recreational uses. The land could no longer be developed in any manner nor was there any evidence presented which showed that the land could have been an attractive purchase for speculators. *See Florida Rock Indus., Inc. v. United States,* 791 F.2d at 901–03. The only possible use for the land, at one time, may have been for hunting. Yet, it is highly doubtful that hunting would have been permitted on the property after the permit denial since the denial was in part motivated to preserve certain endangered species which existed in these wetlands. It is clear then that the only use remaining for the 12.5 acres was for the land to remain in its natural state as an empty lot. This court is compelled to view such property as taken. *See Q.C. Constr. Co. v. Gallo,* 649 F.Supp. at 1337, *1902 Atlantic Ltd. v. Hudson,* 574 F.Supp. at 1405.

Yet, defendant cites several cases to the contrary. These cases have held that land cannot be viewed as taken where that land must remain in its natural state since an "owner of land does not have an absolute and unlimited right to change the essential character of ... [its] land so as to use it for a purpose for which it was unsuited in its natural state." *Smithwick v. Alexander,* 114 N.H. 124, 336 A.2d 239, 243 (1975); *Just v. Marinette County,* 56 Wis.2d 7, 201 N.W.2d 761, 768 (Wis.1972).[12] Apart from the inherent illogic of these formulations, there exists one central problem in applying these decisions to our jurisdiction. Each of these decisions are in part based on the rationale of "the importance of wetlands to the public health and welfare [and have found that the importance of the wetlands] clearly outweighs the degree of damage sustained by plaintiff[s involved]." *Id.* This rationale, however, as stated earlier, is contrary to the Federal Circuit's conclusion holding that the "balancing of public and private interests [in preserving wetlands] reveal[ed] a private interest much more deserving of compensation for any loss actually incurred." *Florida Rock Indus., Inc. v. United States,* 791 F.2d at 904. Thus, this court is most reluctant to follow non-binding precedent, *e.g., Town of N. Bonneville Wash. v. United States Dist. Court, W. Dist. of Wash.,* 732 F.2d 747, 751 (9th Cir.1984) ("Neither the District Court or the Claims Court is bound by the determination of the other as to its jurisdiction."); *see, e.g., Key v. Wise,* 629 F.2d 1049, 1058 (5th Cir.1980) ("[F]ederal courts are not bound by state decisions on matters of federal law"), *cert. denied,* 454 U.S. 1103, 102 S.Ct. 682, 70 L.Ed.2d 647 (1980), where this court's binding precedent speaks with a different voice. RUSCC General Order No. 1(1), (XXI); *see Dean v. United States,* 10 Cl.Ct. 563, 567 (1986).

Even if the cases cited by defendant were not partially based on a policy rationale rejected by the Federal Circuit, this

---

12. Defendant also cites *Buttrey v. United States,* 690 F.2d 1170, 1177 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), as support for its proposition that no taking can occur where the land must be left in its natural state. This case, however, is clearly inapplicable since it concerns a due process claim and not one for Fifth Amendment compensation.

court still would be most reluctant to adopt the holding which they espouse. Under the undisputed facts given, it is hard to imagine a takings claim more deserving of compensation. Plaintiffs' land has suffered a severe economic impact. The permit denial has reduced the property's current value to, at most, only two percent of what it was previously. Moreover, plaintiffs' reasonable, investment-backed expectations have been frustrated. Plaintiffs intended to purchase the land for development or at least for resale. The undisputed facts provided show that the possibility for development no longer exists. The most these facts provide for is the resale of the property at a mere fraction of the property's original value. This court must, therefore, reject the idea that a Fifth Amendment takings claim can be avoided by requiring citizens to sell their property where the government's intrusion has reduced the value of the property to a mere fraction and where the property was left with no other available uses. *See Althaus v. United States,* 7 Cl.Ct. 688, 695 (1985) (a taking was found where the government's classification of the land required the land to be left in its primitive and primeval state and where the resale value was reduced to a fraction of the property's value). *But cf. Kirby Forest Industries, Inc. v. United States,* 467 U.S. at 1, 104 S.Ct. at 2189 (1984) (the substantial reduction to the property's value was held insufficient where the petitioner was free to make whatever use it pleased of the property, including the cutting down of trees or the development of the land in some way). For should this court rule otherwise, the Fifth Amendment would be effectively turned on its head, and that noble protection of the citizenry would be rendered meaningless.

In its motion for summary judgment, defendant also raises an issue with respect to the one acre of uplands involved in this case. Specifically, defendant makes reference to the fact that the one acre of uplands is outside the jurisdiction of the Army Corps of Engineers. According to defendant then, the one acre cannot be held as taken since the fill of that land could

proceed with or without the approval of the Corps.

The problem with defendant's argument is that it ignores the particular location of the one acre of uplands involved. The one acre of uplands is not adjacent to other uplands property. Rather, the one acre of uplands is, in effect, an island surrounded by a sea of wetlands. Property so situated can be considered taken even though that property itself is not directly effected by the regulation at issue. A taking of such property is found where the government's regulations imposed on the surrounding wetlands have cut off all the routes of access to the property or have cut off all the property's routes of access which remain. *Laney v. United States,* 228 Ct.Cl. 519, 523, 661 F.2d 145, 149 (1981) (case involving the possible denial of access through wetlands to plaintiff's upland property not subject to the Corps' jurisdiction).

Therefore, defendant is not entitled to prevail on its motion with respect to this one acre of uplands because the known facts do not exclude the possibility that plaintiffs have been effectively denied all meaningful access to this "island." As for the 12.5 acres as a whole, defendant's motion for summary judgment must be denied as well since the regulation's intrusion on the property and interference with plaintiffs' reasonable investment-backed expectations cannot be considered so slight as to refute plaintiffs' takings claim as matter of law. In fact, the assumptions provided under defendant's motion so strongly favor plaintiffs' position that plaintiffs' claim would have prevailed as a matter of law had the court been able to utilize those assumptions in its review of plaintiffs' cross-motion for partial summary judgment.

### B.

*Review of Plaintiffs' Cross–Motion for Partial Summary Judgment*

The facts provided in plaintiffs' cross-motion for partial summary judgment are somewhat different than those provided in defendant's initial motion. Both parties do

agree that the property was worth approximately $4 million before the permit denial and that the property could have been used for residential development at that time.[13] Yet, there is considerable disagreement with respect to the use and value of the property after the permit denial.[14]

According to defendant, the property has substantial post-denial value and use. Defendant's experts estimate the post-denial value of the property at $680,000. They have determined that the one acre of uplands could still be used for residential development, but that the 11.5 acres could no longer be used for that purpose. The only remaining use available to the 11.5 acres of wetlands indicated by defendant's experts was as a lagoon access to and from the one acre of uplands.[15] This access could theoretically be created by bulkheading the surrounding wetlands and would provide the uplands with a right of way for passage; for the placement of a sewage system; and for the placement of underground electric, cable television, and gas connections.

Plaintiffs, on the other hand, contend that the property was rendered completely useless after the permit denial. Its expert, Ard, estimates the post-denial value at $13,725.50. This $13,725.50 valuation was based on the property's possible purchase as an extension of a wildlife reserve or for some other conservational use.[16]

Because this court is resolving plaintiffs' cross motion for partial summary judgment, this court is obligated to view both parties' contentions of fact in a light most favorable to the nonmovant defendant. *See, e.g., Hodosh v. Block Drug Co.*, 786

F.2d 1136, 1141 (Fed.Cir.1986), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed. 2d 55; *S. La. Grain Serv., Inc. v. United States*, 1 Cl.Ct. 281, 289 (1982). Thus, this court must resolve plaintiffs' cross-motion for partial summary judgment by assuming that the property had a post-denial value of $680,000. This court must also assume that the one acre of uplands could have been used for residential development and that the 11.5 acres of surrounding wetlands could have been used as a right-of-way.

Plaintiffs argue, however, that defendant's version of the facts should not be accepted for the purposes of plaintiffs' cross-motion because defendant's expert appraisals have formulated a plan which is so implausible that it creates no genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see, e.g., Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560 (Fed.Cir.1987). In particular, plaintiffs contend, along with various attached affidavits, that defendant's proposed development of the 12.5 acres in dispute could not have been achieved because the state government and the Army Corps of Engineers would never have issued the necessary permits. Plaintiffs additionally argue that the plan was infeasible because it would have required an easement through neighboring private property.

Plaintiffs attempt to have this court find its version of the facts as true by motion, however, this cannot be accepted. While plaintiffs' criticisms of defendant's plan have put the credibility of such a plan in doubt, the court is most reluctant to deny

---

**13.** This pre-denial value and use of the 12.5 acres agreed to by both parties for the purposes of plaintiffs' cross-motion for partial summary judgment is the same as that agreed to by both parties for the purposes of defendant's initial motion for summary judgment.

**14.** Defendant initially accepted plaintiffs' post-denial estimation of the land's value and use. Defendant then changed its position a few days before oral argument and introduced two affidavits indicating that the land was left with much greater potential. *See generally Loveladies Harbor, Inc. v. United States*, 15 Cl.Ct. 375 (1988).

**15.** Defendant's experts also briefly mentioned that the 11.5 acres of wetlands could be used for water-related marine activities, or as a fishing and crabbing dock over the existing channel ways.

**16.** The post-denial value and use of the land alleged by plaintiffs here is the same as that value and use alleged by plaintiffs in their opposition to defendant's initial motion for summary judgment.

defendant an opportunity to refute plaintiffs' criticisms in the factual context of a trial. After all, doubts, inferences, or issues of credibility under this motion must be resolved against the moving party, *Candeleria v. United States*, 5 Cl.Ct. 266, 271 (1984); *see, e.g., United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam), for such issues are better suited for resolution at trial. This general rule with respect to the nonmovant defendant's position is even more desirable in this situation because of the fact-intensive nature of just compensation cases. *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983); *Anchor Estates, Inc. v. United States*, 9 Cl. Ct. 618, 622 (1986). If indeed such criticism proves to be well-founded, and if defendant's arguments in opposition are completely frivolous, Rule 11 provides plaintiff with an appropriate remedy. Fed. R.Civ.P. 11. *See generally* Oliphant, *Rule 11 Sanctions and Standards: Blunting the Judicial Swords*, 12 Wm. Mitchell L.Rev. 731 (1986).

As discussed in this court's review of defendant's motion for summary judgment, the resolution of a takings claim first requires that the value taken from the property be compared with that value remaining. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 107 S.Ct. at 1248. This comparison must reveal a reduction of substantial value. *Althaus v. United States*, 7 Cl.Ct. at 693; *see, e.g., Skaw v. United States*, 740 F.2d at 939 (a mere diminution in value is not enough to establish a taking); *Jentgen v. United States*, 228 Ct.Cl. at 532, 657 F.2d at 1213 (a mere diminution in value is not enough to establish a taking). Moreover, even if that reduction turns out to be substantial, a taking cannot be found where that reduction in value stands alone as the basis for the claim. *E.g., Penn Cent. Transp. Co. v. New York City*, 438 U.S. at 131, 98 S.Ct. at 2662; *Goldblatt v. Hempstead*, 369 U.S. at 594, 82 S.Ct. at 990; *see Kirby Forest Indus., Inc. v. United States*, 467 U.S. at 14–15, 104 S.Ct. at 2196–97 (the substantial reduction in value to the property was held insufficient where the petitioner was free to make whatever use it pleased of the property, including the cutting down of trees or the development of the land in some way); *see also Hadacheck v. Sebastian*, 239 U.S. at 405, 36 S.Ct. at 143 (a reduction in value of ninety percent alone is an insufficient basis for the establishment of a taking); *Village of Euclid v. Amber Realty Co.*, 272 U.S. at 384, 47 S.Ct. at 117 (reduction of value of 75% alone is an insufficient basis for establishment of a taking). A taking claim also requires that the effected property be deprived of all its economically viable use. *E.g., Lake Nacimento Ranch v. San Luis Obispo County*, 830 F.2d at 981; *1902 Atlantic Ltd. v. Hudson*, 574 F.Supp. at 1405.

In view of these principles and in view of the facts being taken in a light most favorable to nonmovant defendant, this court cannot hold that a taking claim exists as a matter of law. While the impact on the value of plaintiffs' land may have been severe, a reduction in value from $3,790,000 to a value of only $680,000, *see Athaus v. United States*, 7 Cl.Ct. at 695 (a reduction of a property's value to less than a third of its original fair market value is no mere diminution in value); *A.J. Hodges Indus., Inc. v. United States*, 174 Ct.Cl. 259, 273–74, 355 F.2d 592, 601 (1966) (a reduction from $216,300 to a value of only $155,200 is not sufficient to constitute a taking), that reduction in value stands alone as the basis of the takings claim under the facts required for resolving plaintiffs' motion. Plaintiffs' land still has some reasonable economic uses. The one acre of uplands, according to these facts, could still be developed for residential housing. The other 11.5 acres could not be so developed but could act as a right-of-way to and from the uplands.

Plaintiffs' cross-motion for partial summary judgment then, like defendant's motion for summary judgment, must be denied. The facts available for the court's review in plaintiffs' motion, i.e., the facts most favorable to nonmovant defendant, do not exclude the possibility that the 12.5 acres in dispute have some remaining use.

## CONCLUSION

Having reviewed defendant's motion for summary judgment and plaintiffs' cross-

motion for partial summary judgment, this court holds that neither motion can prevail as a matter of law. Nevertheless, while the resolution of both motions has not disposed of the case, it has had the effect of significantly narrowing and clarifying the issues for trial.

Upon examination of the regulation's public purpose, plaintiffs have shown that their private interest in developing and utilizing their property outweighs the public value in preserving these wetlands. Turning to the more important test of whether or not the land has been deprived of all its economic viability, it seems clear that no determination can be made at this point, for there is a significant dispute of material fact. The court has indicated, however, that it will view the property as a whole and that the whole includes only the 12.5 acres in dispute.

This court's review of the remaining value of these 12.5 acres as a whole has further shown that a substantial reduction in value has taken place under both parties' version of the facts. Yet, there is still some question as to whether the property has any remaining commercial or economic use or whether the property must remain in its natural state as an empty lot. Therefore, if plaintiffs are able to prove that the land must remain as an empty lot, plaintiffs will be entitled to prevail at trial. On the other hand, if plaintiffs cannot prove that the land was without any significant remaining commercial or recreational use, plaintiffs' claim will have to be denied.

For the above reasons, the court denies both defendant's motion for summary judgment and plaintiffs' cross-motion for partial summary judgment. Both parties are directed to confer within thirty days and to informally determine whether any further discovery is necessary. Both parties are also directed to recommend an approximate date for trial.

IT IS SO ORDERED.

No costs.