**FOREST PROPERTIES, INC.,**

v.

**The UNITED STATES,**

**and**

**Big Bear Municipal Water District, third party.**

No. 92–851L.

United States Court of Federal Claims.

Aug. 6, 1997.

John H. Findley, Sacramento, CA, for plaintiff. Ronald A. Zumbrun and Meriem L. Hubbard, of counsel.

Edward J. Passarelli and Alan Brenner, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant. John Gleason, U.S. Army Corps of Engineers, and Daniel W. Kilduff of counsel.

Wayne K. Lemieux, Westlake Village, CA, for third party.

## OPINION

YOCK, Judge.

This is a regulatory taking action brought by the plaintiff after the Federal Government acting through the United States Army Corps of Engineers denied a dredge and fill permit for the development of land owned by the plaintiff at Big Bear Lake in San Bernardino County, in southern California. Trial was held on September 9–12, 1996, at the United States Courthouse, Pasadena, California.

For the reasons that follow, the Court finds that the plaintiff's property was not taken in violation of the Fifth Amendment to the United States Constitution.

### Statement of Facts

The plaintiff, Forest Properties, Inc. ("FPI"), along with Big Bear Properties, Inc. ("BBP"), are members of a group of companies, all of which are owned by RCK Properties, Inc., which, in turn, is ultimately owned by Mr. Richard W. Colburn and his family. BBP is in the business of real estate holdings, and it generates business revenues by selling real estate property to real estate developers, one of which was FPI. FPI is in the business of real estate development, which, in this case, involved acquiring a parcel of real estate, obtaining the necessary governmental permits to subdivide it, putting in roads and other necessary improvements, and finally selling the improved lots to the general public for the construction of single family housing.

In January 1969, BBP acquired approximately 2500 acres of upland property contiguous to Big Bear Lake in San Bernardino County, California, from the Big Bear Development Company for approximately $4 million. As part of this sale, the Bear Valley Mutal Water Company also entered into a binding contract with BBP for an irrevocable, 20–year option on lakebottom land. If exercised within 20 years, BBP, as optionee, would be able to purchase, at the price of

$1,000 per acre, up to 200 acres of lakebottom property within Big Bear Lake. Importantly, a number of conditions were attached to the option for the acquisition of the lakebottom land. For example, by the terms of the option agreement, the optionee could only exercise the option to the lakebottom land if the optionee also owned the adjacent upland property above the high water line. Moreover, in order to retain ownership of the lakebottom land property, any planned fill of the lakebottom property had to be completed within three years after acquiring legal title to the property. Finally, the optionor had to be afforded the right to review and to conceptually approve the design of any planned fill of the lakebottom property.

Twelve years later, in 1981, this option became the subject of a lawsuit filed in the Superior Court of the State of California for the County of San Bernardino, by BBP against the Big Bear Lake Municipal Water District ("Municipal Water District").[1] By this time, the Municipal Water District had succeeded the Bear Valley Mutual Water Company as the party in interest to the option. BBP decided to exercise its option rights to a portion of the lakebottom land, but the Municipal Water District argued that, even though it was the successor-in-interest to the Bear Valley Mutual Water Company, it was not bound to the option agreement. On September 22, 1982, the Superior Court of the State of California for the County of San Bernardino found that the option was binding on the Municipal Water District, and, thus, BBP owned the right to purchase and fill up to 200 acres of lakebottom property in Big Bear Lake. *Big Bear Properties, Inc. v. Big Bear Mun. Water Dist.*, No. VCV–2782 (Cal.Super.Ct. Sept. 22, 1982).

To avoid further appeals and litigation, BBP and the Municipal Water District entered into a settlement agreement on February 18, 1983, ("1983 agreement") that restricted the total amount of lakebottom property that could be acquired by BBP to

---

1. On June 2, 1993, this Court granted the plaintiff's motion to name the Big Bear Municipal Water District as a third party, pursuant to RCFC 14. As a third party, the Municipal Water District was not actively involved in the litigation of this case, although it did monitor the proceedings throughout the trial of this case.

some 28.7 acres. Additionally, both parties agreed that the lakebottom property could only be used for residential housing purposes and that the total amount of acreage that BBP could purchase would be limited to 9.4 acres, located adjacent to or abutting an approximately 67–acre parcel on the south shore of Big Bear Lake known as Eagle Point.[2]

The 1983 agreement also included tentative development plans for the lakebottom parcel adjacent to the Eagle Point area of Big Bear Lake. The development plan showed three peninsulas, plus wildlife habitat islands located offshore of the three peninsulas. Under the 1983 agreement, the Municipal Water District agreed not to "raise any objection * * * based upon issues of development design, density and related esthetic [sic] and environmental considerations" to the plans attached to the agreement. The 1983 agreement provided that, as a result of any exercise of the option by BBP, the deed conveying the lakebottom land would contain a reversionary clause. This reversionary clause stated that title to the land conveyed would revert to the Municipal Water District if the proposed dredging and filling was not completed within three years after the date of the deed.

On March 29, 1984, the Municipal Water District, for valuable consideration, conveyed a 10–year conservation easement of lakebottom property near Eagle Point ("1984 easement") to the United States Forest Service for the purposes of preserving and improving an eagle habitat. By its terms, the 1984 easement expired in 1994. This 1984 easement was not intended to interfere with any rights of BBP. However, the metes and bounds description of the 1984 easement, drawn up by the engineer working for the Municipal Water District, inadvertently overlapped the lakebottom property on which BBP held an option. Importantly, the Municipal Water District was under a California court order that had upheld BBP's option

and, thus, the Municipal Water District presumably lacked the intent to interfere with BBP's rights to the lakebottom option. Consequently, the Municipal Water District's unfortunate titling mistake created a cloud on the title to the lakebottom property adjacent to Eagle Point.

On May 3, 1988, BBP transferred approximately 53 acres of its upland property at Eagle Point to FPI by a corporation grant deed for $3.6 million. This deed did not specifically include the adjacent lakebottom option rights in the transfer of ownership from BBP to FPI. Apparently, FPI recognized that a number of issues were complicating the lakebottom property transfer.[3] Although FPI had always planned to develop Eagle Point as one development ("Eagle Point Estates"), it decided to separate the acquisition of the two parcels of land in order to avoid a premature reversion of the lakebottom parcel to the Municipal Water District. Thereafter, on October 17, 1988, some five months later, BBP assigned the option rights to the 9.4 acre lakebottom property adjacent to Eagle Point to FPI. The document effecting this assignment did not indicate the amount of compensation for this option but merely indicated that the property was transferred for "valuable consideration." Evidence in the record confirms that no additional consideration beyond the $3.6 million paid for the upland 53 acres was paid by FPI to BBP for the 9.4–acre option.

In order to exercise the option, but to avoid a future reversion of the lakebottom property, Mr. Stephen Foulkes, Vice President of FPI, and Mr. James Good, FPI's attorney, negotiated an informal agreement with Mr. Jere Mitchell, General Manager of the Municipal Water District, and Mr. Wayne Lemieux, Sr., the Municipal Water District's attorney, regarding the procedures for exercising the option and purchasing the lakebottom property. Apparently, all of the parties to the option agreement were eager to devise a flexible arrangement that would

---

2. The Eagle Point area of Big Bear Lake was aptly named. The area is a natural gathering, feeding, and foraging area for the American bald eagle.

3. It is important to note that FPI and its sister company, BBP, shared many of the same officers. Therefore, FPI would have been aware of all of the terms of the option, including the reversionary clause in the 1983 agreement.

legally exercise the option immediately but permanently convey legal title at a later date. In order to achieve this mutual goal, their subsequent arrangement had to address a number of vexing problems.

First, the 20–year option was due to expire at the end of that year, *i.e.*, 1988. Although it is not clear from the record or from the testimony of the witnesses, FPI and the Municipal Water District apparently believed that extending the option was not the preferred course of action. The second problem concerned the time constraints imposed upon BBP (and subsequently FPI) by the reversionary clause in the option and the 1983 agreement. Because the reversionary clause stated that title to the land conveyed would revert to the Municipal Water District if the dredging and filling was not completed within three years, FPI believed that the title to the lakebottom property might eventually revert to the Municipal Water District because the estimated time required to obtain the regulatory approvals could exceed three years. Third, in the course of developing the lakebottom property, FPI would have to obtain the approval of several federal and state agencies. FPI surmised that a number of minor changes to the Eagle Point Estates project might be required in order to receive the various regulatory approvals. However, the option and the 1983 agreement contemplated that the Municipal Water District "review, and to approve or disapprove any specific plan for excavation and filling * * * of Lake Bottom Land" to be purchased by the optionor. Specifically, the Municipal Water District had previously informed FPI that, if any changes occurred to the project, the District would reevaluate the shore zone alteration permit previously issued to FPI. Finally, the 1984 easement prevented the Municipal Water District from conveying clear and legal title to the lakebottom property. Therefore, since the three-year reversionary clause period would commence *after the date*

*of the deed,* FPI (and, to a lesser extent, the Municipal Water District) felt that it was more prudent to postpone the transfer of legal title of the lakebottom property until these problems were solved to the parties' mutual satisfaction.

Thus, in order to exercise the option before it expired and to delay the commencement of the reversionary clause, the two parties agreed to let FPI exercise the option, thereby obtaining equitable title to the lakebottom land, and to delay the transfer of legal title until all of the regulatory hurdles had been cleared. In pursuance thereof, by letter of October 19, 1988, Mr. Good, on behalf of FPI, forwarded two draft letters to Mr. Lemieux for his review. One draft letter purported to exercise FPI's option with respect to the lakebottom property adjacent to Eagle Point, while the second draft letter suggested deferral of the *close*[4] of escrow "until the exact acreages [sic] are known following all the regulatory approvals, and particularly in view of the title problem with respect to Eagle Point."

By letter dated November 29, 1988, to Mr. Mitchell, Mr. Foulkes, on behalf of FPI, claimed to have exercised the option, stating that FPI "hereby gives the District notice of its exercise of the option to purchase, as modified by the [1983] Agreement, with respect to the acres abutting the real property described in paragraph 2.b. of the [1983] Agreement, referred to as 'Eagle Point'." In a letter dated November 30, 1988, sent to Mr. Lemieux, Mr. Good memorialized the agreed procedure to complete the purchase and transfer of the legal title to the lakebottom property by postponing the *opening* of the escrow account.[5] Mr. Lemieux, on behalf of the Municipal Water District, signed this letter as approved on December 5, 1988, 27 days before the expiration of the 20–year option.[6] At this point, FPI believed it was the equitable owner of approximately 9.4

---

4. Apparently, the initial suggestion by Mr. Good to delay the *closing* of the escrow account, as opposed to the *opening* of the account, was a mistake. In the subsequent letter describing the purchase of the lakebottom property, the parties mutually agreed to defer the *opening* of the escrow account.

5. *See* note 4.

6. During a meeting of the Municipal Water District's Board of Directors on July 18, 1996, the Board approved an oral resolution finding that the option granted in the 1983 agreement had been validly exercised by FPI in 1988.

acres of lakebottom property adjacent to Eagle Point and the 53–acre upland parcel also owned in fee by FPI.

During the course of the FPI development at Eagle Point, BBP (and subsequently FPI) had sought to obtain a number of federal, state, and local permits. Prior to the sale of the Eagle Point property to FPI, BBP had commenced the process of obtaining the necessary permits. The first stage in the process required BBP to assist the lead state agency in the creation of an Environmental Impact Report ("EIR") pursuant to the California Environmental Quality Act ("CEQA"). In this first EIR, the Municipal Water District was identified as the lead agency for the State of California. Thus, BBP submitted various plans for the Eagle Point Estates project and a draft EIR to the Municipal Water District.

On June 2, 1987, the Municipal Water District issued a Notice of Preparation of Draft EIR for the Eagle Point Estates project. The notice described the project as envisioning "approximately nine (9) acres of new land extending beyond the current highwater line of the lake. Combined with the approximate 53 acres of land above the highwater line at the site * * *." The plans for the project at this point contained three peninsulas, offshore habitat islands for eagles, and a residential island to the east of the most eastern of the three peninsulas.

In June 1987, BBP hired an environmental consultant, Mr. Tom Dodson, to assist BBP in the preparation of various environmental reports that were to be incorporated into the EIR. In October 1987, Mr. Dodson completed a study of the Eagle Point Estates property, which was entitled "A Biological Assessment of the Eagle Point Residential Subdivision," and this study was a part of Eagle Point Estates' overall EIR. The study found that the upland property of some 53 acres at Eagle Point contained 15 rare plant species, including two species that were listed as "endangered species" in rare montane wet meadow habitat. The study noted that Eagle Point had the "highest degree of floral endemism in California and possibly the continental United States for such a small area." Moreover, Eagle Point was identified as a " 'key perching and foraging habitat' for wintering bald eagles," which, at that time, were designated as an endangered species by the United States Government.

On July 5, 1988, the Municipal Water District issued the "Conditions of Approval of Eagle Point Property" and a final EIR was prepared in August 1988 that approved the Eagle Point Estates project. Claiming that the EIR was inadequate under CEQA, however, on August 10, 1988, the State of California challenged the validity of the EIR in the Superior Court of the State of California for the County of San Bernardino. On April 25, 1989, the Superior Court ruled that the EIR was inadequate under CEQA and ordered the preparation of a new EIR. *State v. Big Bear Mun. Water Dist.*, No. BCV–4778 (Cal.Super.Ct. Apr. 25, 1989). The practical effect of this judgment was to void all previous permits approved pursuant to the August 1988 EIR and to force FPI to begin the regulatory process all over again.

In response to this setback, FPI aggressively attempted to correct the EIR. The Eagle Point Estates' design plan was modified by reducing the project into one described as "53.36 acres existing plus 5.4 acres lake bottom." [7] A second EIR was prepared that incorporated improvements to the first EIR by refining its mitigation measures. For example, FPI retained Dr. Charles Goldman, professor of ecology and limnology at the University of California, Davis, and Dr. John Reuter in order to design a dredge and fill procedure for the project's lakebottom property. Eventually, the final design of the Eagle Point Estates project included about 25 different measures designed to protect the environment.

Throughout the development process of the Eagle Point Estates project, FPI interacted with a number of federal and state agencies in order to enlist support and approval for its project. Among the federal agencies with jurisdiction over the property

7. As described in FPI's application for approval of the tentative tract map by the City of Big Bear Lake.

was the United States Department of the Interior, Fish and Wildlife Service ("FWS"). Although the FWS would ultimately not support the project, it offered a variety of suggestions to increase mitigation measures and to decrease any potentially harmful effects on the environment. FPI went to great lengths to develop additional mitigation measures and to integrate the FWS's suggestions into the second EIR. For example, FPI eliminated two of the project's proposed three peninsulas, shifted the fill to the far eastern edge of the project, placed eagle perch trees on open space lots, protected every part of the endangered species plant habitat, provided one-for-one mitigation for wetland habitat, and dedicated nearly 16 acres of upland property (over 25 percent of the project's total area) to open space on the Eagle Point Estates project site with an endowment for maintaining and managing it.

With regard to the State of California, all indications were that the Eagle Point Estates would obtain all regulatory approvals. The City of Big Bear Lake, the new lead agency under CEQA for the second EIR, issued its Notice of Public Hearing on the Final Environmental Impact Report for the project on July 17, 1991. On July 25, 1991, the Community Development Department of the City of Big Bear Lake issued its Notice of Determination, stating that the EIR was prepared for the Eagle Point Estates project, and found that the project would not have an adverse effect on the environment. On July 30, 1991, the City of Big Bear Lake issued its approval of FPI's Eagle Point Estates subdivision in its Mitigation Measures and Conditions of Approval for Eagle Point Estates. Finally, the Municipal Water District issued its Notice of Determination, approving FPI's shorezone alteration permit for Eagle Point Estates, conditioned on the observance of mitigation factors. As far as the State of California was concerned, the project could proceed.[8] There were no legal challenges to this revised EIR and, thus, the only remaining regulatory hurdles were within the jurisdiction of the Federal Government.

Previously, by application dated March 16, 1988, BBP had submitted Application No. 88–160, Department of the Army, Corps of Engineers ("Corps"), for a section 404 permit under the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251 et seq. (1994) ("Clean Water Act"), to dredge and fill 9.4 acres of lakebottom property, included in the Eagle Point Estates project, in order to build residential lots. The permit application described the project as "[a] total of 62 acres (9 acres of filled area) * * * developed with approximately 100 lots." At the time of the application, the proposed project had been somewhat modified by the deletion of the habitat islands and the residential island but still included the three peninsulas. By a letter dated April 4, 1988, the Corps notified BBP that it was reviewing the section 404 permit application and estimated that the processing time would be 60 to 90 days.

Upon the completion of the sale of the upland property at Eagle Point on May 3, 1988, but before the exercise of the option by FPI on December 5, 1988, Mr. Dodson informed the Corps, by a letter dated October 11, 1988, that FPI would assume the section 404 permit application, previously submitted by BBP, and would continue the procedure to gain approval of the section 404 permit application. Throughout its consideration of FPI's permit application, the Corps (and other federal agencies) expressed a willingness to work with FPI in developing additional information needed to demonstrate compliance with federal environmental regulations. In the period between March of 1988 and the end of 1991, FPI had numerous communications with various federal agencies, regarding its section 404 permit, culminating with a "Revised Project" presented to the Corps. The "Revised Project" proposed a development with 57.6 acres of land and 4.4 acres of lakebottom property with one peninsula requiring dredge and fill to accommodate residences, a marina, and other recreational

8. State and local approvals that were necessary in order to dredge the lakebottom parcel had been obtained, including a waste discharge permit from Santa Ana Regional Water Quality Control Board, a 1603 permit from the California Department of Fish and Game, a grading permit from the City of Big Bear Lake, and the aforementioned shorezone alteration permit from the Municipal Water District.

amenities. As early as February 17, 1989, in a letter to FPI, however, the Corps was signaling that it might deny the 404 permit application.

In order for permits to be issued for the proposed projects, they must be found to comply with the 404(b)(1) guidelines and be found not contrary to the public interest. If we were asked for a final decision at this time with the information we currently possess, our recommendation to the District Engineer would be that the projects do not meet either criteria for permit issuance and should be denied.

Eventually, as the Corps' review process dragged on, FPI requested a meeting with the Corps in order to clarify its present views on the issues of bald eagles, wetland habitat, aquatic habitat, endangered species, practicable alternatives, and the economics of the project. On January 22, 1992, after FPI had presented its views on these issues, Colonel Thomas, the district engineer responsible for the Corps' decision, addressed the FPI representatives. Although the parties had different interpretations of Colonel Thomas' conversation with FPI, neither party disputed that the greatest impediment to a section 404 approval was the on-site alternatives and the cost evaluations prepared with respect to the practicable alternatives to FPI's development plan. The permit requested was for the dredging and filling of the lakebottom property to create a peninsula on which approximately 14 expensive, single-family houses were to be built. Housing is generally considered to be a nonwater-dependent activity. Housing specifically, and nonwater-dependent activities in general, in special aquatic sites in waters of the United States, is almost always denied permits because the presumption exists that there are water-dependent practical alternatives in aquatic sites that are not as environmentally damaging as nonwater-dependent activities. Thus, FPI's dredge and fill permit request presented a difficult hurdle in its attempt to demonstrate a least damaging practicable alternative to the Corps.

One month later, on February 24, 1992, the Corps formally denied FPI's section 404 permit application for the lakebottom fill portion of the Eagle Point Estates project. In the letter detailing its decision, Colonel Thomas explained that the Corps denied the permit for numerous reasons, such as concerns regarding water quality, the negative impact on endangered plant and animal species, and the belief on the part of the Corps that there were practicable alternatives to filling the Eagle Point Estates lakebottom property that would have less adverse effects on the environment. The decision letter stated in pertinent part:

a. 404 (b)(1) guidelines:

(1) There are practicable alternatives to the proposed discharge that would have less adverse effect on the aquatic ecosystem and those alternatives do not have other significant adverse environmental consequences.

(2) The proposed discharge will result in significant degradation of the aquatic ecosystem under 40 CFR 230.10(b) and (c).

(3) The discharge does not include all appropriate and practicable measures to minimize potential harm to the aquatic ecosystem.

b. Public interest factors:

(1) Effects on special aquatic sites—the project would destroy approximately 7 acres of vegetated shallows below the ordinary high water line, and have at least 1.6 acres of impact on wetlands above the high water line.

(2) Water quality—the project has the potential to reduce the water quality of Big Bear Lake and Summit Creek by increasing pollution from the developed areas, and increasing turbidity and polluted runoff during and after construction.

(3) Mitigation—the mitigation proposed for this project is inadequate. Further, certain uncompensated impacts such as the removal of shallow-water, near-shore habitat and the reduction in the value of bald eagle perch trees will occur. As such, the mitigation proposed would cause a substantial temporal loss in resource availability to wildlife.

(4) General environmental concerns— approximately 7 acres of special aquatic sites would be permanently destroyed by

the project as proposed. One federally-designated endangered animal species, two federally endangered plant species, fifteen sensitive plant species, and their habitat would be negatively impacted.

(5) Shore erosion and accretion—a stable shore zone would be replaced by a shore zone which would require reinforcement to prevent erosion and accretion around the peninsula.

(6) The public and agency responses to the Public Notice and subsequent responses have been opposed to the project.

* * * *

In consideration of the public interest review factors mentioned above, I find that issuance of a Department of the Army permit for the project as proposed, as prescribed by regulations published in 33 CFR Parts 320 to 330, and 40 CFR Part 230, is contrary to the public interest and your permit request is hereby denied.

Finally, Colonel Thomas stated that the Corps would continue to consider any subsequent application for a section 404 permit that FPI might wish to submit.

By letter of March 5, 1992, addressed to the Corps, FPI responded to the permit rejection. This letter reflected FPI's belief that the Corps was amenable to a new application addressing the concerns expressed by Colonel Thomas, in the denial of FPI's initial application, but retaining the plans to dredge and fill the lakebottom property as in the original permit application. However, FPI had misunderstood the extent of its permit problems, and a subsequent letter by Colonel Thomas, dated April 7, 1992, specifically stated:

My letter of February 24, 1992, listed the justifications for permit denial. * * *

My reference to a revised development proposal did not mention fill in the lake for the purpose of housing nor did I mean to imply that such fill had become acceptable to the Corps. Rather, I referred to a revised development proposal that would allow other possible uses of the Eagle Point property, such as higher-density lots on the available upland portions of the property.

Apparently anticipating the futility of obtaining a section 404 permit to dredge and fill the lakebottom property, FPI had modified the Eagle Point Estates project and submitted such a section 404 permit application on March 4, 1992. Consequently, FPI notified the Corps by letter dated August 14, 1992, that it intended to proceed with the development of the upland portion of Eagle Point Estates. Additionally, the letter stated FPI's intentions to dredge, but not fill, a small portion of the lakebottom land in order to provide recreational access to Big Bear Lake for Eagle Point Estates residents.[9] The Corps did not assert jurisdiction over this planned dredging. Additionally, FPI successfully obtained two nationwide permits from the Corps to construct a bridge and utilities over a stream within the upland portion of the Eagle Point Estates.

Eventually, the modified Eagle Point Estates project was completed pursuant to amended plans that were developed as a result of the Corps' denial of FPI's section 404 permit application. Presently, Eagle Point Estates consists of 106 single-family lots located in the upland portion of Eagle Point.[10] A limited, recreational access to Big Bear Lake is provided to the residents via a pier on a small area of lakebottom property that was dredged by FPI. Nearly 16 acres of upland property have been dedicated to open site as environmental mitigation measures.

The total current listed sales price for the lots at Eagle Point Estates is $12,048,400. Mr. Richard W. Colburn indicated in his deposition that the fair market value of Eagle Point Estates is approximately the listed sales price for the lots, i.e., $12 million. In a letter to the Bank of America dated June 9, 1992, Mr. Colburn also stated that the total

9. Although the fill portion of the project was never completed, some dredging was conducted that resulted in deeper water (and presumably a better dissolved oxygen content) in the dredged location. At the time, no Corps permit was required for such an operation limited to dredging.

10. Plaintiff retains an area of undeveloped land at Eagle Point Estates that could be developed into an additional two or three saleable lots.

development costs of Eagle Point Estates (including land costs) would be about $7,100,-000. As of August 30, 1994, the plaintiff had sold a total of 25 out of 106 lots in Eagle Point Estates for $3,547,900. All but one of the lots sold at or above the listed sales price, with the remaining lot sold to Mr. Foulkes at approximately cost value. In a letter to Mr. Colburn, fax dated July 3, 1991, Mr. Foulkes presented a financial evaluation of the Eagle Point Estates project in terms of its profit potential. He estimated that, if the 404 fill permit was not granted, the profit generated would range between $2 million and $4 million and, if the fill permit was granted, the profit would run between $3.6 million and $6.3 million. As of April 30, 1996, closed sales of 28 lots generated proceeds in the amount of $4,208,000, and Mr. Foulkes testified that as of September 1996, at least 33 lots had been sold, with others still in escrow. Mr. Colburn attributed the number of remaining unsold lots to the downturn in the real estate market in southern California. The loss of the 14 lots on the proposed peninsula amounted to a decrease in developable land of some 15 percent of the project, although the market value of the lakeshore lots would have been among the highest of all of the lots in the development.

On December 16, 1992, FPI filed a Complaint in this Court alleging an inverse condemnation. FPI believes that, by denying the section 404 permit, the Government effectuated a taking, which requires just compensation pursuant to the Fifth Amendment.

*Discussion*

■ The Fifth Amendment to the United States Constitution provides, in relevant part, that "private property [shall not] be taken for public use without just compensation." It is well established that a taking can be accomplished by governmental regulation. As the United States Supreme Court found in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." In *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980), the Su-

preme Court stated that "application of a general zoning law to particular property effects a taking if the ordinance * * * denies an owner economically viable use of his land, see *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 138 n. 36 [98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631] (1978)."

Further, as the Supreme Court has held in *Pennsylvania Coal,* the question of whether or not the taking reaches "a certain magnitude" is one that is particularly fact dependent. *See Pennsylvania Coal,* 260 U.S. at 413, 43 S.Ct. at 159. The Supreme Court has "eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and [has] relied instead on ad hoc, factual inquiries into the circumstances of each particular case." *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

■ In this regulatory taking case, the first matter this Court must decide is whether or not the plaintiff had a sufficient *ownership* or compensable interest in the land allegedly taken so as to invoke the protection of the Fifth Amendment. Since this Court finds herein that FPI had a compensable property interest in the lakebottom land, the next step is to determine which taking analysis is appropriate in this case, *i.e.,* a categorical taking analysis (in which a physical occupation occurred or all beneficial or productive use of the property has been prohibited) or a regulatory or partial taking analysis (in which a regulation may have gone "too far" but stops short of a categorical taking). Critical to this Court's determination that the regulatory taking analysis is the appropriate method to use to analyze FPI's taking claim is its determination of the relevant parcel that has been allegedly taken. In this case, the Court finds that the parcel as a whole is the 62–acre Eagle Point Estates, which includes the 9.4 acres of lakebottom property and the inextricably linked 53 acres of upland property. Thus, only a small portion of the plaintiff's property has allegedly been taken, and, because a categorical taking did not occur, a regulatory or partial taking analysis is appropriate in this case.

■ Finally, the Court will analyze FPI's taking allegation utilizing the three factors identified in *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659. This Court will determine whether or not the denial of FPI's application for a 404 permit to dredge and fill constituted a taking by analyzing the character of the governmental action, the extent to which the regulation interfered with FPI's investment-backed expectations, and the regulation's economic impact on FPI. Under this three-tiered analysis, this Court concludes that FPI cannot establish a taking under the Fifth Amendment.

## I. FPI's Property Interest in the Lakebottom Land.

■ In order for the plaintiff to maintain a taking action for just compensation under the Fifth Amendment, it must establish that it had an *ownership* interest in the land allegedly taken. Here, the plaintiff maintains that it has validly exercised an option that has given it equitable title to the 9.4 acres of wetlands contiguous to the 53–acre upland portion of the Eagle Point Estates development. It also owns the fee title to the 53 upland acres which are not at issue in this case. The Government, however, has a rather broad-gauge argument that basically rejects the idea that the plaintiff had legally exercised the option to acquire title to the 9.4

acres of lakebottom property.[11] The Government's primary argument on this issue is that FPI's proposal to defer opening the escrow account improperly attempted to extend the length of the 20–year option.[12] Since the option was improperly exercised, the defendant argues, the option right expired after the 20–year time period had run; therefore, the plaintiff did not own the equitable title to the 9.4 acres of lakebottom land. However, this argument is premised on an incorrect application of the law. Interpretation of land contracts and option rights are a matter of state law. As such, this Court must look to California law to determine what constitutes the proper exercise of an option right.

■ An option is a unilateral contract by which the optionee receives the right from the optionor to create a bilateral contract of purchase during the life of the option. *Erich v. Granoff*, 109 Cal.App.3d 920, 167 Cal.Rptr. 538, 542 (1980). Moreover, an option must be exercised in the time and manner described by the option instrument. *See Riverside Fence Co. v. Novak*, 273 Cal.App.2d 656, 78 Cal.Rptr. 536, 539 (1969). However, if the option agreement does not specify any particular manner by which the option must be exercised, any method is permissible. *Id.* (citing *Lawrence v. Settle*, 182 Cal.App.2d

11. Importantly, there is no evidence to suggest that the parties to the option agreement ever believed that FPI had not properly exercised its option. Certainly, the Municipal Water District never objected to FPI's tender of the exercise of the option. Indeed, the Municipal Water District was the lead state agency on the initial EIR addressing the proposed lakebottom fill project.

12. The Government also raises two minor arguments that can be disposed of summarily. First, the Government contends that, even if FPI had validly exercised the option, conditions subsequent to the exercising of the option and conditions precedent to the performance of the purchase of the lakebottom property existed—that is, the Municipal Water District's approval of any plans for the excavation and fill of the lakebottom property prior to purchase. The Government, however, is simply speculating when it states that FPI would not have been able to secure the remaining outstanding permits and the Municipal Water District's approval in order to convert its equitable interest in the lakebottom property into a legal title to the property as the result of a completed purchase. As stated above,

FPI had secured the permission of many state and local regulatory authorities. Not only was the Municipal Water District the lead state agency for the first EIR, but FPI had also obtained a shorezone alteration permit from the Municipal Water District on August 1, 1991.

Second, the Government maintains that, even if FPI had been able to purchase the property, it would not have been able to *retain* ownership because the option and the 1983 agreement had a *reversionary* clause. This reversionary clause stipulated that the lakebottom property would revert to the Municipal Water District if the plans for the excavation and fill of the property were not completed within three years of the *date of the deed*. However, this argument is unavailing because, as a result of its exercising the option, FPI held equitable title to the 9.4 acres of lakebottom property but would not obtain legal title, *and a dated deed*, until after all of the necessary permits had been obtained. Thus, the three-year period stated in the reversionary clause would not commence until FPI received legal title through a properly executed and filed deed.

386, 6 Cal.Rptr. 49, 51 (1960)). Most importantly, unless specified in the option agreement, tender of the purchase price is not required to properly exercise one's option rights. *Erich,* 167 Cal.Rptr. at 542–43; *Riverside Fence Co.,* 78 Cal.Rptr. at 539. "Indeed, it is generally recognized that payment of the purchase price in an option contract is, unless otherwise stated in the contract, an obligation to be performed by the optionee in his performance of the conditions of the bilateral contract of purchase and sale which is formed upon the exercise of the option." *Erich,* 167 Cal.Rptr. at 542–43; *see also Murfee v. Porter,* 96 Cal.App.2d 9, 214 P.2d 543, 548–49 (1950) (noting that nothing in the option clause required payment of the price of the land to be made or tendered when the option right was exercised in order to constitute an acceptance). In order to constitute a binding contract for the sale and purchase of the property, the optionee need only give notice of acceptance of the right. *Id.*

▮ FPI, as the optionee, attempted to exercise its option rights by notifying the Municipal Water District, in writing, that it was exercising its option to the 9.4 acres of lakebottom property located at Eagle Point. Critically, there is no provision in the option that required the *sale* to be completed within the 20–year period. Thus, the performance of the contract was deferred by the mutual agreement of the parties. The delay in opening the escrow account was designed to be effective until the Municipal Water District cleared its title problems with the 1984 easement and Eagle Point Estates received all of its regulatory approvals. This mutually agreed deferral, while each party attended to details hindering immediate performance, constituted consideration on the part of each of the deferring parties. *See Frankel v. Board of Dental Exam'rs,* 46 Cal.App.4th 534, 54 Cal.Rptr.2d 128, 136 (1996).

▮ As stated earlier, supra at note 6, the Municipal Water District unanimously passed an oral resolution stating that FPI had properly exercised the option. Therefore, even if the acts of Municipal Water District agents Mr. Mitchell and Mr. Lemieux, Sr., had been unauthorized in 1988, the Municipal Water District's Board of Directors found that the option was validly exercised by FPI. Subsequent ratification renders an agent's action binding on a board of directors as of the time the unauthorized act was performed. 2 WITKIN, SUMMARY OF CALIFORNIA LAW, *Agency and Employment* § 87 (9th ed.1987). A municipality is subject to the same rule. 45 CAL. JUR. 3D *Municipalities* § 321 (1978); *see also Baker v. City of Palo Alto,* 190 Cal.App.2d 744, 12 Cal.Rptr. 425, 432 (1961) ("The city could, like any other party, retroactively adopt prior acts or fix retroactive dates of execution of the contract.").

Finally, nothing in the option required the Municipal Water District's *approval* of the proposed fill *before* the option could be exercised, only that it be afforded the opportunity in the future to approve or disapprove any proposal. While the Municipal Water District retained a right to review and approve or disapprove any specific plan for excavation and filling, this right to review FPI's plan was a completely separate step that could only occur after the option was exercised. The exercise of the option was done by the November 29, 1988 letter from Mr. Foulkes to the Municipal Water District. No third party action was referenced in that exercise of the option. It was only after the exercise of the option, when the contract had already been formed, that Mr. Good's November 30, 1988 letter to Mr. Lemieux discussed how the contract was to be performed. Since third-party approval was not a condition precedent required by the option, it merely pertained to the performance of the contract, not to its formation. *See Murfee,* 214 P.2d at 548–49.

Accordingly, it is clear from the evidence that FPI properly exercised its option to purchase the lakebottom property. FPI's option contract did not specify that the tender of payment for the lakebottom property was required in order to properly exercise the option. In fact, there is no indication that the option specified any particular manner by which the optionee had to exercise its option rights. Considering this lack of particularity, and especially in light of the option agreement not requiring that the optionee tender payment as part of an effective

exercise, the Court does not find that FPI improperly exercised its option rights with respect to the lakebottom land. FPI has validly exercised its option on the lakebottom land, and the property was under contract of sale to FPI.

 Under California law, contract rights, including option contracts, are considered property interests. *County of San Diego v. Miller*, 13 Cal.3d 684, 119 Cal.Rptr. 491, 496, 532 P.2d 139, 144 (1975). The United States Supreme Court also has confirmed that contract rights are a form of property within the purview of the Fifth Amendment. *See, e.g., United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 1516 n. 16, 52 L.Ed.2d 92 (1977) (government bonds); *Armstrong v. United States*, 364 U.S. 40, 46, 80 S.Ct. 1563, 1567–68, 4 L.Ed.2d 1554 (1960) (mechanic's lien); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 601–02, 55 S.Ct. 854, 868–69, 79 L.Ed. 1593 (1935) (mortgage that constituted a lien under state law); *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843–44, 78 L.Ed. 1434 (1934) (insurance contract). When an option has been exercised under California law, the optionee is the equitable owner of the property and is entitled to just compensation. *County of Santa Clara v. Curtner*, 245 Cal.App.2d 730, 54 Cal.Rptr. 257, 261 (1966); *see also County of San Diego*, 119 Cal.Rptr. at 496, 532 P.2d at 144 (holding that even the owner of an *unexercised* option to purchase land, which was taken by the Government, has a compensable interest). Thus, although the Municipal Water District still owned the legal title in fee, FPI's equitable ownership in the 9.4–acre lakebottom land parcel constitutes a property interest, which is protected and compensable under the Fifth Amendment.

Also, and notwithstanding defendant's arguments to the contrary, this case does not present a "nuisance exception" problem, nor is the Government's "notice defense" argument applicable here. The concept of a nuisance exception from the Takings Clause is a holdover from the cases that did not recognize a taking where a legitimate use of police power had occurred. *See Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (failed attempt to employ the Takings Clause to challenge the prohibition on the operation of a brewery). After the development of the concept of a regulatory taking, the Government continued to be protected from a taking claim when it had acted to prevent a use that was injurious to the community, *i.e.*, a nuisance. *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).

 In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), however, the Supreme Court narrowed the concept of uses that may be considered injurious to the community to a much more limited concept of uses that would be prohibited by background principles of the state's law of property and nuisance. The Government must establish that "the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Id.*, at 1027, 112 S.Ct. at 2899. For this defense to apply in the Government's favor, the limitation on the owner's interest "cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.*, at 1029, 112 S.Ct. at 2900. Thus, when a plaintiff's use can be enjoined under background principle's of a state's law of property and nuisance, that use is not a part of the property ownership interest to begin with; hence, no taking can result because no property interest was lost. In other words, in order to fall within the nuisance exception, the regulation at issue must do no more than allow the Government to accomplish by decree what an adjacent landowner or the state could have achieved through the state laws of nuisance or property. *Id.*

The Government argues that a court must consider federal laws which were in place prior to FPI's acquisition, in determining whether or not there was a pre-existing limitation on FPI's title. Citing to a decision by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in *M & J Coal Co. v. United States*, 47 F.3d 1148 (Fed. Cir.1995), *cert. denied*, 516 U.S. 808, 116

S.Ct. 53, 133 L.Ed.2d 18 (1995), the Government contends that the relevant background principles that form the basis of the compensable expectancy analysis must include all of the federal laws.[13]

However, contrary to the Government's expansive interpretation of the *Lucas* nuisance exception, the Federal Circuit's plurality opinion in *Preseault v. United States*, 100 F.3d 1525, 1538 (Fed.Cir.1996) explicitly stated that "*Lucas* provides no such support" for the proposition that "background principles" can include federal law. "The background principles referred to by the Court in *Lucas* were state-defined nuisance rules." *Id.* FPI's option and equitable interest in the lakebottom property were defined in reference to California law, and California law contains the appropriate background principles that form the basis of the compensable expectancy analysis. The Eagle Point Estates project neither constituted a nuisance nor was prohibited by California property law. The project's final EIR had been certified under CEQA, and there is no evidence that any portion of the project would have endangered public health and safety.[14] Therefore, the nuisance exception problem does not exist in this case.

The Government also argues that because the section 404 regulatory structure was in place prior to FPI's acquisition of the lakebottom property, the Corps' denial of the permit demonstrates that the Eagle Point Estates project was constrained by a preexisting and valid law. This amounts to the so-called "notice defense." Courts have examined the import of an existing regulatory structure at the time of purchase in terms of both the nature of the plaintiff's property interest and the plaintiff's investment-backed expectations. *Compare M & J Coal Co. v. United States*, 30 Fed.Cl. 360, 367 (1994) ("A compensable right does not exist * * * if at the time of sale an existing law or regulation precluded a certain use * * *.") with *Creppel v. United States*, 41 F.3d 627, 632 (Fed. Cir.1994) (stating that inquiring into the plaintiff's investment-backed expectations "limits recovery to owners who can demonstrate that they bought their property in reliance on the nonexistence of the challenged regulation."). In fact, some courts have found that an existing regulatory structure may negate the existence of a compensable property interest. This Court believes, however, that a *permit*-based regulatory system presents a situation in which it is fallacious to argue that the existence of the regulatory regime can deny a property owner the requisite compensable property interest.

The Government's contention runs counter to the nature of a permit system, "after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). It may be the case that in those instances where a regulation provides an outright ban on a particular use of a plaintiff's property, the owner did not have a compensable property interest. However, since in a permit-based system, up to the time of the permit denial (which would also be the time that the alleged taking occurred), it was possible that the property owner could have received the permit, it is incongruous to argue that the owner never had a compensable property interest to begin with. Rather, this Court believes that, where there is a regulatory permit procedure in effect, the plaintiff's compensable interest is best examined on the merits in terms of the owner's reasonable investment-backed expectations and not as a threshold matter in

13. Even assuming that the Government is correct, however, the fact that it took the Corps four years to deny the permit application indicates that the Corps had to go through an extensive process in order to determine that the project did not comport with the Corps' regulations. Obviously, if the defect had inhered in the title or in the project *ab initio*, the Corps presumably would have reached that conclusion much earlier.

14. Conflicting evidence exists as to whether or not there would have been an adverse impact on the aquatic ecosystem, a positive impact on the aquatic ecosystem, or offsetting effects. However, there is simply no evidence in the record that a nuisance would have been created or that a violation of California state property law would have occurred as a result of any portion of the project.

terms of whether or not the landowner owned a compensable property interest.

In summary, FPI legally exercised its option to 9.4 acres of lakebottom property adjacent to its upland property at Eagle Point. As a result, FPI was (and still is) the equitable owner of the lakebottom property with a compensable interest in this property. FPI and the Municipal Water District agreed to a variety of conditions that had to be satisfied prior to the purchase of the lakebottom property, but both parties had made substantial progress in satisfying these conditions. With regard to a pre-existing limitation on FPI's proposed use of the 9.4 acres, the proposed dredge and fill of the lakebottom property did not violate state nuisance or property law such that the use was not a part of the plaintiff's ownership interest. Finally, section 404's regulatory structure did not serve to divest the plaintiff of its compensable property interest merely because it was in place prior to FPI's acquisition of the lakebottom property.

## II. Taking Analysis and the Relevant Parcel.

■ After concluding that FPI had an ownership/compensable property interest, the Court can now proceed to examine whether or not a constitutionally-recognized taking has occurred, i.e., whether or not there was a total or near-total loss of viable economic use. Taking jurisprudence has acknowledged that a regulatory process, such as that developed under the Clean Water Act, can effect a taking. *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171 (Fed.Cir. 1994); *Ciampitti v. United States*, 22 Cl.Ct. 310 (1991). In cases involving allegations that a taking was caused by a regulation, there are two possible types of takings. The first is termed a categorical taking, and such a taking results "where [the] regulation denies all economically beneficial or productive use of [the] land" or is a physical occupation of the land. *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893 (citing *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141; *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 834, 107 S.Ct. 3141, 3147, 97 L.Ed.2d 677 (1987); *Keystone*, 480 U.S. at 495, 107 S.Ct. at 1247; *Hodel v. Virginia Surface Mining & Reclamation*

*Ass'n, Inc.*, 452 U.S. 264, 295–96, 101 S.Ct. 2352, 2370–71, 69 L.Ed.2d 1 (1981)). In those instances where a regulation denies an owner of *all* economically beneficial use of his land, a *per se* or categorical taking results, and the Court need not proceed with any further inquiry. A taking has occurred.

■ By comparison, a regulatory or partial taking pursuant to a regulation may occur when the imposition on the owner's land is "one step short of complete." *Lucas*, 505 U.S. at 1019 n. 8, 112 S.Ct. at 2895 n. 8. There is no bright-line rule, in these instances, to determine whether or not a taking has occurred. Rather, courts have engaged in essentially "ad hoc, factual inquiries" into the circumstances of each particular case. *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390–91, 62 L.Ed.2d 332 (1979). To assist in this examination, the courts have advocated the application of a tripartite test to determine whether or not a compensable taking has occurred. *Lucas*, 505 U.S. at 1019–20 n. 8, 112 S.Ct. at 2895–96 n. 8 (Stating that where a property owner "might not be able to claim the benefit of our categorical formulation" and quoting from *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659, that the test to be applied examines " '[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations' * * * ."); *accord Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1072 (Fed.Cir.1994) (applying three-part test to partial taking cases); *Bowles v. United States*, 31 Fed.Cl. 37, 49 (1994). In summary, the three factors of the three-tiered test to be considered are: (1) the character of the governmental action, (2) its interference with reasonable investment-backed expectations, and (3) the economic impact of the Government's action on the landowner. *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659; *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984); *Golden Pac. Bancorp*, 15 F.3d at 1072.

■ The dichotomy developed between a categorical taking and a regulatory taking compels this Court first to define the parameters of the relevant parcel. If the Court

were to have decided that the pertinent property was solely the 9.4 acres of lakebottom property for which FPI sought, and was subsequently denied, a section 404 permit, then this Court would most likely have proceeded to analyze this case as a *Lucas*-type categorical taking. The justification would be that the value of the lakebottom land was essentially eviscerated due to the inability of FPI to dredge and fill the area and place residential homes on the acreage.[15] However, because the Court finds that the pertinent parcel in this case is the entire 62–acre Eagle Point Estates project (*i.e.*, the 53 acres of upland property in conjunction with the 9.4 acres of lakebottom land), then the Court must approach this case using a regulatory or a partial taking analysis since there is clearly substantial value remaining in the total parcel at issue.

The United States Court of Appeals for the Federal Circuit, in determining the relevant parcel for taking cases, advocates "a flexible approach, designed to account for factual nuances." *Loveladies Harbor*, 28 F.3d at 1181. This Court in *Ciampitti*, 22 Cl.Ct. at 318, detailed an extensive list of factors which a court should consider when attempting to determine what constitutes the relevant parcel:

> Factors such as the degree of contiguity, the dates of acquisition, the extent to which the parcel has been treated as a single unit, the extent to which the protected lands enhance the value of remaining lands, and no doubt many others would enter the calculus.

FPI, in asserting that only the 9.4–acre lakebottom property is the relevant parcel, focuses on the "separateness" of the transactions. Specifically, FPI relies on the different dates upon which the upland property was acquired and the option rights were transferred, the separate consideration that was paid for the upland property, and the option rights.[16]

This Court must be wary of focusing solely on the particulars of a transaction. Such a myopic approach would allow sophisticated real estate investors to design a transaction so as to segregate those parts of a parcel which could run afoul of regulations, such as the Clean Water Act, and maximize the possibility of a successful taking claim. As noted in *Ciampitti*, "a taking can appear to emerge if the property is viewed too narrowly." *Id.* at 319.

▮ Rather, in addition to the factors described in *Ciampitti*, a court should focus on how the economic expectations of the claimant, with respect to the parcel at issue, have shaped the owner's actual and projected use of the property. *Keystone*, 480 U.S. at 499, 107 S.Ct. at 1249 (property "is viewed in the context of any reasonable unit of petitioners' coal mining operations and financial-backed expectations * * *."); *Ciampitti*, 22 Cl.Ct. at 318 (stating that one factor to consider in determining the relevant parcel is "the extent to which the whole parcel could be developed."); *see also American Sav. & Loan Ass'n v. County of Marin*, 653 F.2d 364, 371 (9th Cir.1981) (noting that how a parcel would be treated at the development stage is dispositive in defining the parcel). A property owner, who treats a series of parcels as one property for the purposes of development, financing, planning, and utilization, cannot then segregate the properties for the purpose of establishing a taking claim. Aside from the analytical flaws inherent in ignoring these considerations, the approach advocated by this Court comports with the underpinnings of taking jurisprudence. In a regulatory or a partial taking claim, the Court must examine the extent to which the value of an owner's property has been diminished by the Government's action. However, if a property owner treats a series of properties as one income-producing unit, the value lost to the claimant is not simply the loss of the segregated parcel affected by the Gov-

---

15. An argument could be made that even if the Court would decide to consider the relevant parcel to be the 9.4 acres of lakebottom alone, that considerable value remains in the land for use by the owner even if it cannot use the property to dredge, fill and put residential houses on it.

16. The evidence presented in this case supports a finding by FPI that there was no separate consideration paid for the option, outside of the $3.6 million paid by FPI to BBP, for the 53 upland acres.

ernment action, but the decrease in the owner's ability to utilize the unified parcels as one income-generating unit. Any other approach would elevate the style of the transaction over the substance of a property owner's treatment of a parcel.

Considering the above-described analysis, it is clear that the relevant parcel in this instance is the entire 62–acre Eagle Point Estates project (i.e., the 53 acres of upland property in conjunction with the 9.4 acres of lakebottom land). This is true for several reasons. First, the upland property and the lakebottom land are contiguous parcels. In fact, the option to the lakebottom property could only be exercised if the optionee owned the adjacent upland property. To this Court, this is strong evidence that these two properties should be deemed one parcel for this taking analysis. In addition, while FPI makes much of the different dates upon which the upland property and the option rights were acquired, this Court believes that, to the contrary, a mere five-month separation in time is more indicative of the unity of the two parcels than the separation of the parcels. This, to the Court, evidences a clear and consistent intent by the plaintiff to treat and to develop the properties as one unit. Finally, and perhaps most importantly, from the time of the purchase of the upland property, FPI's economic intentions were to utilize the lakebottom acreage and the upland parcel in conjunction with each other as one income-producing unit. For instance, the revised draft of the Eagle Point Estates EIR, dated March 1991, and prepared for the City of Big Bear Lake, described the importance of the lakebottom land to the marketing and to the value of the Eagle Point Estates project. The EIR indicated that Eagle Point was selected because "it would best achieve the overall project objective." The EIR explained that the following factors were used in making this judgment:

2. The physical characteristics of the site will allow boating access to the lake;

3. The existence of "Dredge and Fill" rights associated with the property to create access[.]

The EIR continued that the "combination of a strong demand for lake access lots, coupled with very little competition to supply such lots, provides a major marketing advantage for the applicant's property." Thus, FPI viewed the lakebottom property and the upland property as two complimentary units of one income-generating parcel, with the lakebottom property providing the owners of the lots on the upland areas with access to the lake for recreational purposes, and owners of the water front lots on the filled portions of the lake with an aesthetically unique setting.

Other documentation in the record indicates the unity, for the purposes of development and the economic expectations of FPI, of the upland and lakebottom parcels. On May 5, 1988, FPI applied to the Community Development Department of the City of Big Bear Lake for approval of the Eagle Point Estates tract. FPI included in this application drawings of the development showing a residential subdivision with three peninsulas created by fill from the lakebottom. The application further described the project as "53.36 acres existing plus 5.4 acres lake bottom." This description of the Eagle Point Estates as one unified development utilizing both the upland and the lakebottom property pervades the numerous permit applications which FPI submitted, including the plaintiff's section 404 permit.[17] Accordingly, this Court finds that the relevant parcel for this taking analysis is the combined upland and lakebottom parcels, which constituted the Eagle Point Estates development. This conclusion is a product of the contiguity of the properties, the temporal proximity of the purchase of the upland property and the option rights, and the unity of use proposed by FPI for the upland and lakebottom properties, throughout the entire planning and development process.

Once the relevant parcel has been determined to be the entire 62 acres, it is indisputable that the parcel as a whole has substan-

17. While all of the various permit applications include descriptions of the project encompassing the upland and lakebottom properties, there are slight variances in the number of acres which FPI planned to dredge and fill.

tial remaining economic viability. After the denial of its permit, FPI continued to carry on its intended business, *i.e.*, selling lots at Eagle Point Estates.[18] Indeed, most of FPI's own market projections demonstrated that FPI expected to a make a considerable profit on the Eagle Point Estates project even without the filled lakebottom lots.[19] Clearly, the Corps' denial of FPI's permit did not deprive FPI of *all* economic viability for the relevant parcel. On the contrary, the facts undeniably confirm that substantial and viable economic use remains in the integrated development of uplands and lakebottom at the Eagle Point Estates project. Thus, a categorical taking, or a *per se* taking, simply did not occur.[20]

III. Regulatory/Partial Takings Analysis.

Having determined that the relevant parcel for analysis in this case is the entire 62–acre Eagle Point Estate project, this Court will now proceed to analyze the present case pursuant to the regulatory/partial takings paradigm. As explained, *supra*, in these instances, a court must determine when a regulation causing "a partial loss of economic use of the property has crossed the line from a noncompensable 'mere diminution' to a compensable 'partial taking.'" *Florida Rock Indus., Inc. v. United States*, 18 F.3d 1560, 1570 (Fed.Cir.1994). In order to determine whether or not that reduction in value rises to the level of a compensable partial taking under the Fifth Amendment, the Supreme Court has resolved the issue by using the three-tiered analysis initially espoused in *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659, and recently reaffirmed as the appropriate analytical framework in *Lucas.* The three-tiered analysis used in *Penn Cent. Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659 examines: (1) the character of the governmental action, (2) the extent to which the regulation interferes with the claimant's investment-backed expectations, and (3) the economic impact of the regulation on the landowner.

The *Lucas* court omitted discussing factor number one (the character of the governmental action) as a factor in a partial takings analysis. *Lucas*, 505 U.S. at 1019 n. 8, 112 S.Ct. at 2895 n. 8. The probable reason was that this factor generally prompts inquiries as to whether or not the Government's action is analogous to a physical invasion of its property, with compensation being more likely in such instances. *Keystone*, 480 U.S. at 488–89 n. 18, 107 S.Ct. at 1243–44 n. 18. However, the Corps' regulations, contrary to FPI's claim, do not involve the Government effecting a physical invasion of its property.

18. For example, as of August 30, 1994, the plaintiff had sold a total of 25 out of its 106 lots in Eagle Point Estates for $3,547,900. All but one of the lots sold at or above the listed sales price, with the remaining lot sold to Mr. Foulkes at approximately cost value. As of April 30, 1996, closed sales of 28 lots generated proceeds in the amount of $4,208,000.

19. Mr. Richard Colburn testified that the fair market value of Eagle Point Estates is approximately the share price for the lots, *i.e.*, approximately $12 million. In a letter to the Bank of America on June 9, 1992, Mr. Colburn also stated that the total developed costs of Eagle Point Estates (including land costs) would be about $7,100,000, therefore generating a profit of roughly $5 million. In a letter to Mr. Colburn, fax dated July 3, 1991, Mr. Foulkes presented a financial evaluation of the Eagle Point project in terms of its profit potential. He estimated that if the section 404 fill permit was not granted, the profit generated would range between $2 and $4 million, and that if the fill permit was granted, the profit would run between $3.6 million and $6.3 million.

20. FPI also contends that the denial of its permit constituted a physical occupancy of the lakebottom property and, thus, a categorical taking by way of an environmental easement. FPI's logic is flawed. FPI was under a statutory prohibition against unpermitted discharges into the waters of the United States. FPI's permit for a non-water-dependent activity in a special aquatic site was denied because less damaging alternatives existed. The Federal Circuit has emphasized that Clean Water Act restrictions on the filling of wetlands cannot be equated with physical occupations, stating that a taking claim arising out of a section 404 permit denial "raises a regulatory takings claim and only a regulatory takings claim." *Loveladies*, 28 F.3d at 1175; *see also Yee v. City of Escondido*, 503 U.S. 519, 527, 112 S.Ct. 1522, 1528, 118 L.Ed.2d 153 (1992) ("The government effects a physical taking only where it *requires* the landowner to submit to the physical occupation of his land.") FPI's lakebottom property was wetland property prior to the application for a section 404 permit. The Corps' denial merely maintained the status quo and did not physically occupy FPI's property.

Rather, the regulations at issue act to proscribe the owner's use of its property.

 Furthermore, FPI did not challenge the Government's action as being arbitrary or capricious by the Corps' implementation of section 404 of the Clean Water Act. Because wetlands serve important environmental functions, *see, e.g., Riverside Bayview Homes,* 474 U.S. at 131–35, 106 S.Ct. at 461–64, there is no room for doubt that the governmental action in this case served an important purpose via the process for obtaining a section 404 permit. *See Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 904 (Fed.Cir.1986) (stating that "the preservation of wetlands bears a substantial relationship to the public welfare as perceived by the best lights of our time"); *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1192–94 (1981). Thus, this Court will not examine any further the character of this legitimate Government action. This nation clearly has a legitimate public welfare duty to preserve the nation's wetlands, and it is a worthy national goal.

The second factor to be examined is the interference with FPI's investment-backed expectations. FPI's section 404 permit application was for the dredge and fill of approximately 9.4 acres of lakebottom property in order to augment the building of the residential development, known as Eagle Point Estates. The Corps' denial of FPI's application was based on a variety of review factors, including detrimental effects on special aquatic sites, water quality, threatened and endangered plant and animal species, shore erosion, and shore accretion. All of the major regulatory agencies, including the United States Environmental Protection Agency ("EPA"), the United States Department of the Interior's Fish and Wildlife Service, the United States Department of Agriculture's Forest Service, and the California Department of Fish and Game had recommended the denial of FPI's 404 permit application.

In the face of this regulatory consensus, FPI maintains that its investment-backed expectations are compensable with respect to the development of the Eagle Point Estate project. As support of its position, FPI notes that it spent four years developing mitigation measures with the Corps and that there never was any indication from the Corps that FPI could not overcome any obstacles to receiving a section 404 permit. In addition, FPI notes that the placement of fill in other areas of Big Bear Lake had been approved in the years preceding the FPI application for a section 404 permit.

 The Court notes, however, that an investment-backed expectation "must be more than a 'unilateral expectation or an abstract need,'" it must be reasonable. *Ruckelshaus,* 467 U.S. at 1005–06, 104 S.Ct. at 2874 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980)). In those instances where a regulation limits an owner's use of his land, by inquiring into the claimant's investment-backed expectations, a court "limits recovery to owners who can demonstrate that they bought their property in reliance on the nonexistence of the challenged regulation." *Creppel,* 41 F.3d at 632. *See also Concrete Pipe & Prods. of California, Inc. v. Construction Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 645–46, 113 S.Ct. 2264, 2291–92, 124 L.Ed.2d 539 (1993); *Ruckelshaus,* 467 U.S. at 1005–06, 104 S.Ct. at 2874–75 (no reasonable expectation that EPA would keep information confidential considering regulatory scheme). A regulatory scheme affecting the property at issue at the time of purchase can significantly discount an owner's investment-backed expectations with respect to the property. In fact, numerous courts have found that a regulatory structure can thoroughly abrogate a property owner's investment-backed expectations. *See, e.g., Golden Pac. Bancorp,* 15 F.3d at 1074 ("Given the highly regulated nature of the banking industry, * * * the Comptroller's actions could not possibly have interfered with a reasonable investment-backed expectation * * * ."); *Ciampitti,* 22 Cl.Ct. at 320–22 (no reasonable investment-backed expectations that an owner could develop wetlands in light of Clean Water Act's section 404 permit system). The rationale underlying these decisions is two-fold. First, to hold otherwise would turn the Government into an involuntary guarantor of the property owner's gamble that he could develop the land as

he wished despite the existing regulatory structure. *Ciampitti*, 22 Cl.Ct. at 321. Second, it is assumed that when a property owner purchases property that is subject to regulations which may proscribe, or limit certain uses of the property, "the owner presumably paid a discounted price for the property. Compensating him for a 'taking' would confer a windfall." *Creppel*, 41 F.3d at 632. Thus, this Court must be wary of the speculator syndrome and analyze the plaintiff's expectations in light of the regulation, the agencies' actions, and the reasonableness of the plaintiff's economic expectations.

The Clean Water Act was enacted in 1972 and prohibits the discharge of pollutants into waters of the United States except in compliance with, *inter alia*, section 404 of the Act. 33 U.S.C. §§ 1251(a), 1311(a) (1994). Paragraph (a) of section 1344 authorizes the Secretary of the Army to issue permits for the "discharge of dredged or fill material into the navigable waters * * *." 33 U.S.C. § 1344(a) (1994). In order to assist in administering the Clean Water Act, the Corps is provided with certain criteria that it must weigh in determining whether or not to issue a section 404 permit. Some of the factors include whether or not the dredge and fill will contribute significantly to the "degradation of the waters of the United States," 40 C.F.R. § 230.10(c) (1991) and whether or not there are practicable alternatives which would have less impact on the water's aquatic ecosystem, 40 C.F.R. § 230.10(a). If a project associated with a proposed discharge into a "special aquatic site" [21] is not "water dependent," [22] "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise * * * [and] all practicable alternatives * * * which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." 40 C.F.R. § 230.10(a)(3).

Further, the section 404 guidelines make specific reference to consideration of adverse impacts on threatened or endangered plant and animal species. Part 230.10(b) and (b)(3) of title 40 provides that "[n]o discharge of dredged or fill material shall be permitted if it: ' * * * Jeopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended * * *.'" Subparts D and E of part 230 further discuss the potential impacts on threatened and endangered species and special aquatic sites, including the destruction of habitat, contamination and reduction of food sources, and elimination of breeding and nesting areas. *See* 40 C.F.R. §§ 230.30–.40.

This well-developed regulatory scheme was firmly in place and being enforced at the time FPI purchased the upland property and the option rights in 1988. Well prior to this time period, the public was clearly on notice that the development of wetland areas was subject to compliance with section 404 of the Clean Water Act. As a sophisticated real estate developer, FPI would be charged with knowledge of this regulatory scheme. Indeed, FPI also had actual knowledge that the lakebottom property was subject to the section 404 permit application process. When it purchased the option rights to the lakebottom property, FPI assumed, as the party in interest, the section 404 application already in process, which had been commenced by its sister company, BBP. Thus, FPI knew, at the time of purchase, that it would have to qualify for a section 404 permit in order to develop the lakebottom property in accordance with its plans.

Moreover, prior to the purchase of the option rights, FPI knew that unique, and possibly insurmountable, problems were implicated by its application for a section 404 permit. For instance, Mr. Tom Dodson (plaintiff's environmental consultant), in his "Biological Assessment of the Eagle Point Residential Subdivision," noted that the area

---

**21.** Special aquatic sites include wetlands of the type at issue in this case.

**22.** A project is not water dependent if it "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purposes * * *." 40 C.F.R. § 231.10(a)(3). For example, a housing project is not considered to be water dependent, while a marina is or would be considered to be water dependent to fulfill its basic purpose.

contained 15 rare plant species, with two of these species being endangered, and that the area was a key perching habitat for wintering bald eagles, which were also an endangered species at the time. In a letter dated March 14, 1987, Mr. Dodson stated that FPI's application to fill the lakebottom property "is likely to require much more consultation with respective agencies than is normally the case with similar projects." On June 2, 1988, the EPA sent a letter to the Corps, with a copy to the applicant, stating that the EPA objected to the project as a nonwater-dependent project in a special aquatic site. In a July 18, 1988 letter to Mr. Dodson, the EPA reiterated the applicable permit requirements and again explained the effect of a nonwater-dependent project. Mr. Dodson's August 5, 1988 letter to the Corps reflects that he was engaged in a dialogue with the Corps concerning the water-dependency issue and regulatory restrictions. On October 11, 1988, Mr. Dodson forwarded a practicable alternatives report to the Corps and the EPA and, in the sane letter, requested that the applicant's name be changed to FPI in order to reflect FPI's purchase of BBP's option to the lakebottom property. In response to these facts, FPI decided to exercise its option to the lakebottom property in a way that would enable it to have more than three years in which to clear all of the necessary regulatory hurdles. Thus, prior to its purchase of the property at issue, FPI was aware not only that the lakebottom land was subject to the section 404 permit application process but that the application could be denied due to significant federal and state environmental concerns.

In many ways, FPI's attempt to dredge and fill the lakebottom property in order to build a residential project was a quixotic quest from the outset. Mr. John Winn, formerly Acting Regulatory Branch Chief of the Corps of Engineers, testified that, based on his experience since he began with the program at its inception in 1974, housing has never been considered a water-dependent activity. Thus, if an applicant proposes a non-water-dependent use (i.e., a housing project), it is presumed that there are less damaging alternatives. Therefore, in his view, the non-water-dependent status of a housing project makes the likelihood of securing a section 404 permit extremely unlikely. In his entire career, Mr. Winn testified that he was not aware of any section 404 permit applications that had been issued for housing on fill in the waters of the United States that constituted aquatic sites (FPI's situation here). In addition to detailing the fragile environmental conditions at the Eagle Point Estates project and the lack of adequate mitigation measures in FPI's proposed plans, Mr. Joseph Johns, President of Envicom Corporation, emphasized that FPI should have known that a residential development was not a water-dependent activity, especially in a special aquatic site, and permission to construct housing on the filled in wetlands would be denied as a matter of course. Ultimately, of course, the permit was denied primarily based on the water-dependency issue.

FPI's stated belief that it could overcome the regulatory hurdles involved in developing the lakebottom land is not satisfactorily reasonable for a variety of reasons not the least of which was that it was at least equally plausible that the Corps would disagree with FPI and deny its application for a section 404 permit. FPI's subjective "unilateral expectation" that it could obtain the section 404 permit through mitigation efforts simply does not give rise to a reasonable investment-backed expectation. See *Ruckelshaus,* 467 U.S. at 1006, 104 S.Ct. at 2874–75. In stating that previous fill projects had been approved before 1983, FPI fails to mention that these projects were approved by the Municipal Water District and were not approved by the Corps.[23] Thus, these prior approvals are not pertinent to a discussion of whether or not FPI could reasonably expect the Corps to approve its dredge and fill project. Moreover, even if the Corps had approved previous projects, this would not make FPI's expectation to develop the lakebottom property any more reasonable. See *Golden Pac. Bancorp,* 15 F.3d at 1075 (prior permissive conduct by Government in administering regulations does not affect investment-backed expectations because Govern-

---

23. The Corps started asserting jurisdiction over wetlands on Big Bear Lake in 1985.

ment could enforce regulations in more stringent fashion if it so chose). Finally, a growing stubbornness appears to have permeated FPI and its agent as the plaintiff was repeatedly appraised of the nonwater-dependent nature of the property and the fact that its alternatives analysis was inadequate. For example, in reaction to the EPA's letter of February 3, 1989, to FPI, which stated that the project was not water dependent and would be opposed on that basis, Mr. Dodson suggested in a letter to Mr. Foulkes, dated February 17, 1989, that FPI not address the remaining issues because they involved "other alternatives which I do not believe we should concede exist until the issue of the fill rights has been fully resolved in court."

■ In summary, FPI acquired the Eagle Point Estates property and exercised its option to the lakebottom property after the imposition of, and with the full knowledge of, the regulatory framework. Most importantly, FPI simply had no reasonable basis in fact or in law for expecting that it would receive a section 404 permit to fully develop the lakebottom property part of Eagle Point Estates. The plaintiff and its agent were repeatedly told by numerous agencies of the state and the Federal Government of the deficiencies in their application for a project of this type, that, according to several witnesses, had never been approved in the history of the regulation. FPI took a business risk that it would be able to obtain a section 404 permit in order to exploit its property interest in the lakebottom property and Eagle Point. Simply because FPI was thwarted from doing so by reasonable regulations designed to protect the environment and the wetlands does not establish a sufficient reason for the Court to intervene and protect FPI against the downside of that business risk. Consequently, this Court must hold that FPI did not have a reasonable investment-backed expectation that it could dredge and fill the lakebottom land attached to the development of Eagle Point Estates at Big Bear Lake.

■ Having decided that the FPI did not have a reasonable investment-backed expectation of developing the lakebottom portion of the project as planned, the Court must still determine the economic impact of the regulation on the plaintiff's plans. Courts have applied relatively flexible standards to determine whether or not Government action has impacted the value of an owner's land so as to constitute a taking. Generally, courts will compare the value taken from the property in relation to that value remaining. *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 394 (1988) (citing to *Keystone,* 480 U.S. at 497, 107 S.Ct. at 1248). Of primary importance, however, is that the owner "show a serious financial loss from the regulatory imposition." *Loveladies Harbor,* 28 F.3d at 1177.

Both parties introduced real estate appraisal evidence based on appraisals supporting their separate interpretations of the remaining economic value. FPI's real estate expert, Mr. Frank LaBella, stated that the highest and best use of the lakebottom property would be 14 lakefront lots with docks available for each of the 14 lots, as FPI proposed in its project plans. Mr. LaBella furnished a comparable cost study of the sales of 47 residential lakefront lots, and all but two were located along the south shore of Big Bear Lake, in the same geographical area of the Eagle Point subdivision. The average value of the 14 lakefront lots in FPI's project would be $263,000 per lot. Once the costs of dredge and fill, grading, curbs, gutters, streets, utilities, engineering, environmental, permits, and other costs of development were factored into the appraisal, the net estimated value of the 14 lakefront lots would be some $2.36 million. Thus, FPI argues that it has suffered a categorical taking of its property interest in the 9.4 acres of the lakebottom land in the amount of $2.36 million.

Not surprisingly, the Government's appraisers, Mr. John C. Donahue, President of Donahue and Company, and Mr. Jeff Kauttu, a Senior Appraiser at Donahue and Company, arrived at a much different conclusion. The Government's experts calculated the fair market value of the property immediately before and after the alleged regulatory/partial taking. In the before and after scenario, they estimated the fair market value of the

**80**

9.4 acre parcel alone with no right to a permit. Alternatively, they valued the entire combined upland and submerged parcel totaling 62.3 acres in the before and after scenario assuming full development rights for a residential subdivision with respect to the 52.9–acre upland parcel but no such permit for the submerged 9.4–acre portion. In a somewhat bold and telling assumption, they concluded that obtaining such a permit was not reasonably probable. Fifteen sales were analyzed and, based upon this data, the Government's appraisers concluded that there was no change in the highest and best use using the comparable sales approach to value.

■ As a result of many assumptions, speculations, and inherent biases, neither of the parties' appraisers appeared completely objective in evaluating the remaining economic value of FPI's property. However, utilizing some of their analyses and common sense, it simply cannot be said that FPI suffered the reduction in value in the parcel as a whole which is required to support a taking claim.[24] An examination of the quantum of land implicated by the denial of the section 404 permit exhibits to this Court that the Government's action in the case has merely caused a noncompensable diminution in value of FPI's land, which is not "serious" enough to cause a Fifth Amendment taking. First, the lakebottom was to occupy only approximately 9.4 acres of a residential development totaling some 62 acres. Although no houses can now be built on the lakebottom property, this property has not ceased to exist and as such it retains value to the development as a whole. As a result of the denial of the section 404 permit, FPI can still develop, and indeed has developed, the remaining 53 acres of upland property. Thus, the Corps' denial of the section 404 permit has prohibited FPI from developing only some 15 percent of the land of the parcel at issue. Also, the lakebottom parcel was only intended to contain 14 of the 123 lots planned for Eagle Point Estates—less than 11 percent of the total number of lots. Examining

these facts is an acceptable means by which a court can determine the economic impact of a regulation. *See Deltona Corp.,* 657 F.2d at 1192 (denying takings claim where a plaintiff was prohibited from developing 20 percent of total acreage in entire parcel and 33 percent of developable lots). Moreover, as already indicated, the plaintiff retains considerable value in the parcel as a whole. The total current listed sales price for the lots at Eagle Point Estates is $12,048,400. Mr. Colburn has testified that the fair market value of the Eagle Point Estates is approximately the listed sales price for the lots, *i.e.,* $12 million. In a letter to the Bank of America dated June 9, 1992, Mr. Colburn also stated his opinion that the total development costs of Eagle Point Estates (including land costs) would be about $7 million, leaving a profit to be generated of about $5 million. This assessment of value is bolstered by Mr. Foulkes in his letter to Mr. Colburn on July 3, 1991, when he estimated that the profit potential, even without a section 404 fill permit being granted, would still run between $2 million and $4 million; whereas if the fill permit were granted, the profit potential would run between $3.6 million and $6.3 million. As of April 30, 1996, closed sales of 28 lots had generated gross sales proceeds in the amount of $4,208,000, with some 80 lots still remaining for sale. Upon examination of these facts, the Court holds that the Corps' action did not prevent all or substantially all of the economically viable use of the property, and, thus, the economic impact of the regulation is not sufficiently severe to constitute a taking.

### IV. Final Summary.

In this action, the plaintiff contends that the Government, by denying its Clean Water Act section 404 permit application to dredge and fill approximately 9.4 acres of wetlands, took its property without just compensation, in violation of the Fifth Amendment to the United States Constitution. Although the Court finds that FPI did have a compensable property interest in the lakebottom property by its exercising an option to purchase the

24. It should be noted that the Court took a site visit to the Big Bear Lake area during the course of the trial and thus became conversant with the

Eagle Point Estates project and the surrounding comparable properties.

wetlands, the Government's regulations did not effect a recognized, compensable taking. This is so because the relevant parcel to be considered is the combined 62–acre Eagle Point Estates. There was neither a physical taking nor invasion of this property and thus no categorical taking of this property occurred. Under the regulatory/partial taking analysis, the plaintiff is unable to demonstrate that there was any deficiency in the character of the Government's action, nor is the plaintiff able to demonstrate that it had reasonable, investment-backed expectations in the development of the lakebottom property in the manner in which it had proposed. Finally, there is substantial economic value remaining in the parcel as a whole, which supports the conclusion that the Government's denial of the plaintiff's permit only caused a noncompensable, mere diminution in the value of its property, which is not substantial enough to protect as a taking. Thus, the plaintiff's claim for just compensation, based on a regulatory/partial taking analysis, is denied.

## CONCLUSION

For the foregoing reasons, the Court finds that the plaintiff has not established a Fifth Amendment taking claim against the United States. Therefore, the plaintiff's Complaint is to be dismissed, and the clerk of the Court is directed to enter judgment accordingly.

Each party is to bear its own costs.